Dana Leigh THOMPSON, Plaintiff,

v.

COUNTY OF FRANKLIN; and William A. Hughes, Treasurer of Franklin County, Defendants.

No. 92–CV–1258(NPM)(DNH).

United States District Court,
N.D. New York.

Dec. 5, 1997.

Arlinda F. Locklear, Jefferson, MD, for Plaintiff.

Hancock & Estabrook, Syracuse, NY, for Defendants; David E. Peebles, of counsel.

## *MEMORANDUM–DECISION and ORDER*

McCURN, Senior District Judge.

### *Introduction*

Familiarity with the prior proceedings in this action is presumed. In this most recent round of motions, plaintiff Dana Leigh Thompson, an enrolled member of the feder-

ally recognized St. Regis Mohawk Indian Tribe ("the St. Regis" or "the Tribe"), as well as the defendants, the County of Franklin and William A. Hughes, Treasurer of Franklin County (collectively referred to throughout as "the County"), are moving for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff Thompson urges that since her property lies within the boundaries of the St. Regis Mohawk Reservation ("the St. Regis Reservation" or "the Reservation"), as created by the Treaty with the Seven Nations of Canada, 1796 ("the 1796 Treaty"),[1] it is "Indian country"[2] within the meaning of 18 U.S.C. § 1151(a), and thus is not subject to the County's *ad valorem* tax. Primarily on the basis of the foregoing, plaintiff has continuously refused to pay her property taxes.

The County has filed a tax lien against plaintiff's property, contending that that property is taxable because it does not come within the definition of Indian country found in section 1151(a), in that it does not lie within the jurisdictional boundaries of the Reservation created by the 1796 Treaty. The County bases its argument upon the fact that in 1824 and 1825 the Tribe and the State of New York entered into two additional "treaties."[3] From the County's viewpoint, those agreements diminished the Reservation boundaries as originally created by the 1796 Treaty so that plaintiff's property no longer lies within the boundaries of the St. Regis Reservation.[4]

---

1. *See* Complaint, exh. C thereto; *see also* Treaty with the Seven Nations of Canada, 1796, reprinted in II C. KAPPLER, INDIAN AFFAIRS· LAWS AND TREATIES 45–46 (1904) (hereinafter "KAPPLER").

2. Because this statute and the United States Supreme Court refer to "Indian country" and "Indians," to be consistent, this court will also use that terminology, which in no way is intended to offend.

3. As will be discussed herein, it is problematic whether these documents, although denominated as "Treat[ies]," Affidavit of David E. Peebles (Jan. 23, 1997), exh. A and B thereto, are, in fact, treaties executed in accordance with the United States Constitution. Therefore, as did the Second Circuit in *Thompson v. County of Franklin*, 15 F.3d 245 (2d Cir.1994)("*Thompson II* "), hereinafter this court will refer to these documents as "conveyance agreements" or simply "the agreements."

4. As the Eighth Circuit astutely observed in *Yankton Sioux Tribe v. Southern Missouri Waste Management Dist.*, 99 F.3d 1439 (8th Cir.1996), *cert. granted sub nom. South Dakota v. Yankton Sioux Tribe*, —— U.S. ——, 117 S.Ct. 2430, 138 L.Ed.2d 192 (1997): " 'Diminished' and "disestablished" seem to be used interchangeably in some cases. . . . 'Disestablishment' appears to be more precisely used to describe the relatively rare elimination of a reservation, . . . , as opposed to reduction in the size of a reservation or 'diminishment.' . . . " *Id.* at 1443 n. 4 (citations omitted). To avoid confusion, the court stresses that in the present case the County is not arguing that the 1824 and 1825 conveyance agreements disestablished the St. Regis Reservation altogether. Rather, the County is arguing only that the Reservation boundaries were diminished by those agreements, so that plaintiff's property no longer lies within the boundaries of the Reservation as created in 1796.

Plaintiff Thompson responds that these later two conveyance agreements did not diminish or in any way alter the Reservation boundaries, because that can only be accomplished through an act of Congress, and the County can point to no such act here. In making this argument, plaintiff is careful to differentiate between extinguishment of title and termination or diminishment of jurisdictional boundaries. Extinguishment of Indian title to land does not, in and of itself, alter reservation boundaries, argues the plaintiff. Therefore, even assuming *arguendo*, as the County claims, that the 1824 and 1825 conveyance agreements extinguished Indian title, that does not mean that the Reservation boundaries were diminished for jurisdictional purposes.

Throughout this protracted litigation, as just explained, plaintiff's primary argument has been that her property lies within Indian country because it is within the Reservation boundaries as described in the 1796 Treaty, and those boundaries have not been diminished from that time to this. At the court's prompting, during oral argument plaintiff acknowledged that in the alternative she is arguing that if the court is not inclined to find that her property is located within Indian country because it lies within the boundaries of the St. Regis Reservation, then the court should find that her property lies within Indian country because it is located within a dependent Indian community [5]—the second enumerated definition of Indian country contained in section 1151. According to plaintiff Thompson, this court should be able to find, with little difficulty, that her property is part of a dependent Indian community because the Second Circuit has already determined the same, and "[t]his ruling, ..., is the law of the circuit and is binding in this proceeding." Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl. Memo.") at 10–11 (footnote and citation omitted).

Plaintiff's alternative argument can quickly be dismissed, according to the County, because "[t]here is absolutely no evidence in the record to suggest that [her] property is within a dependent Indian community." Tr. at 11. Furthermore, from the County's per-

spective, the plaintiff's "law of the Circuit" argument is flawed because the cases upon which she is relying to support that argument are distinguishable in that the courts in those cases were not faced with the issue which is central here—whether or not the 1824 and 1825 conveyance agreements diminished the Reservation boundaries. What is more, even if that precise issue had been previously litigated, the County suggests, without any analysis, that such dependent Indian community determination would not be binding upon it because it was neither a party to those earlier actions, nor was it in privity with the defendants therein.

Beyond the Indian country status of plaintiff's property, there is an additional issue which these motions present, and that is whether the County has authority to tax that property. Plaintiff maintains that because her property is within Indian country, it is not taxable unless there is an express act of Congress authorizing such taxation, and the County is unable to point to any such taxing authority. Assuming plaintiff Thompson's property is within Indian country, the County responds that it does have the power to tax her property because through the 1824 and 1825 conveyance agreements there was a cession of jurisdiction by the Tribe, and thus there is no legal impediment to the County's taxation of plaintiff's property. If eventually the court finds that plaintiff Thompson's property is not Indian country within the meaning of section 1151, then plaintiff concedes that ends the court's inquiry; there is no need for the court to look any farther for an act of Congress authorizing taxation of plaintiff's property. Tr. at 36. Thus, whether plaintiff's property is taxable by the County turns upon whether it constitutes Indian country within the meaning of section 1151, either because it is located within the boundaries of an Indian reservation or because it is part of a dependent Indian community.

### Background

Resolution of the issue of whether plaintiff's property has continued to retain its reservation status requires the court to care-

---

5. Oral Argument Transcript (Mar. 6, 1997)("Tr.") at 47–48.

fully examine not only the 1796 Treaty which created the St. Regis Reservation,[6] but also the 1824 and 1825 conveyance agreements, which the County contends had the effect of diminishing the Reservation's boundaries.

On May 31, 1796, an "important land cession"[7] occurred between the State of New York and the St. Regis, along with several other tribes. On that date, through the Treaty with the Seven Nations of Canada, the Indians agreed to "cede, release and quit claim to the people of the state of New–York, forever, all the claim, right, or title of them, ..., to lands within the ... state [New York] ...." Complaint, exh. C thereto; and Kappler 45. In addition, that Treaty "reserved" a "tract [of land] equal to six miles square, ... to be applied to the use of the Indians of the village of St. Regis...." *Id.* This 1796 Treaty further "reserved, to be applied to the use of the Indians of the said village of St. Regis, ..., a tract of one mile square, ...." *Id.* The Treaty's proclamation date, or what is sometimes referred to as the date of "ratification," or the date upon which the President of the United States "formally confirm[s] the treaty, sign[s] it, and affixe[s] the great seal of the United States[,]"[8] was January 31, 1797. *See* AMERICAN INDIAN TREATIES 446. As a ratified treaty, this 1796 Treaty appears in the leading compilation of United States treaties with American Indian tribes, "which takes its text from the official publication in the *United States Statutes at Large*."[9] *See* Kappler 45–46.

From the time of the 1796 Treaty until 1816, the St. Regis Reservation boundaries remained intact. Beginning in 1816, however, the state of New York and the St. Regis negotiated a series of agreements purporting to convey large tracts of land within the boundaries of the original Reservation. *See* Plaintiff's Statement of Undisputed Material Facts ("Pl. Undisputed Facts") at ¶ 4; and Statement on Behalf of Defendants Pursuant to Local Rule § 7.1(f) at ¶ 4 ("Def. Undisputed Facts"). Two of those agreements are relevant here. The County maintains that the 1824 and 1825 conveyance agreements not only extinguished title to the Indian lands previously reserved under the 1796 Treaty, but those agreements also diminished the jurisdictional boundaries of the Reservation as created by that Treaty.

By virtue of the June 12, 1824 conveyance agreement, the St. Regis Tribe agreed to "sell and hereby convey" to the State of New York approximately one thousand (1,000) acres of land located within the tracts of land reserved for the Tribe in the 1796 Treaty. *See* Peebles Aff., exh. A thereto. In consideration, the State agreed to pay the St. Regis one thousand seven hundred and fifty dollars ($1,750.00), as well as annual payments of sixty dollars ($60.00) "forever hereafter...."

---

6. During oral argument the County stated that the St. Regis Reservation was not congressionally approved because there was "never any act of Congress[]" creating it. *See* Tr. at 12. Admittedly, there was no *express* act of Congress creating the St. Regis Reservation. But that Reservation was created in accordance with federal law—a fact the County seemingly overlooks. More specifically, as mentioned earlier, the St. Regis Reservation was created in 1796 by a treaty between the St. Regis Indians and the State of New York, and subsequently that Treaty was proclaimed by then President George Washington. In 1796, that is how Indian reservations were created—through the treaty making process under the authority of the United States.

Contrary to what the County insinuated during oral argument, it was not necessary for the United States House of Representatives to ratify the 1796 Treaty because at that time, and, indeed, up until 1871, "the Executive Branch made treaty arrangements with the Indians 'by and with the Advice and Consent of the *Senate*,' Art. II, § 2, cl. 2." *Antoine v. Washington*, 420 U.S. 194, 202,

95 S.Ct. 944, 949, 43 L.Ed.2d 129 (1975)(emphasis added). The House was not a part of the treaty making process then. It was not until 1871, primarily because of the House of Representative's resentment because "it had no voice in the development of substantive Indian policy[,]" that Congress ended treaty making with Indian tribes. *Id.; see also* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 62 (footnote omitted)(Rennard Strickland et al., eds., 1982 ed.)(hereinafter "HANDBOOK"). Therefore, as the foregoing demonstrates, despite the County's assertion to the contrary, the 1796 Treaty did not have to be ratified by the House to gain Congressional imprimatur; the Senate's ratification of the 1796 Treaty was sufficient.

7. HANDBOOK 74.

8. FRANCIS PAUL PRUCHA, AMERICAN INDIAN TREATIES THE HISTORY OF A POLITICAL ANOMALY (hereinafter "AMERICAN INDIAN TREATIES") 446(1994).

9. *Id.*

*Id.* There is no explicit mention of taxation in this agreement.

By a second conveyance agreement, dated September 23, 1825, the St. Regis further agreed to "sell and hereby convey" to the State of New York an additional approximately eight hundred and forty (840) acres of land, also located within the tract of land originally reserved for the Tribe in the 1796 Treaty. *Id.*, exh. B thereto. For that land, the State paid the Tribe two thousand one hundred dollars ($2,100.00) "in full for the same." *Id.* Taxation also is not expressly mentioned in this conveyance agreement.

Because treaties enacted under the authority of the United States Constitution "by themselves were not sufficient for managing relations with the Indians[,]" between 1790 and 1834, Congress enacted a series of laws governing trade and intercourse with the Indians. *See* AMERICAN INDIAN TREATIES 100. Basically, the first Nonintercourse Act, enacted in 1790, codified the policy of federal restraints on alienation of tribal lands,[10] in that, among other things, it prohibited tribes from selling their lands unless the sale was "made and duly executed at some public treaty[] held under the authority of the United States." 1 Stat. 329, 330–31, § 8. *See generally* FRANCIS PAUL PRUCHA, AMERICAN INDIAN POLICY IN THE FORMATIVE YEARS: THE INDIAN TRADE AND INTERCOURSE ACTS, 1790–1834. Thus, in effect, "only the United States government could purchase Indian lands....." HANDBOOK 111. Plaintiff Thompson concedes, as she must,[11] that both the 1824 and 1825 conveyance agreements were executed in conformity with the Nonintercourse Act, 25 U.S.C. § 177.

Plaintiff further concedes that her property is located within the area of land which was conveyed to the State in the 1824 and 1825 agreements. Tr. at 19. Thus, if in the end the court agrees with the County that the 1824 and 1825 conveyance agreements diminished the original boundaries of the St. Regis Reservation, then plaintiff would be forced to acknowledge that her property does not come within the ambit of section 1151(a) because it is not located within the boundaries of an Indian reservation. To establish the Indian country status of her property, plaintiff would then be forced to rely on what clearly is her secondary argument,[12] which is that her property qualifies as Indian country because it is part of a dependent Indian community under 18 U.S.C. § 1151(b).

## Discussion

### I. Legal Standards

Given that the parties as well as the court are quite familiar with the general principles which govern any summary judgment motion, there is no need to reiterate the same herein.[13] Suffice it to say that because, as the parties agree,[14] the issues presented by these cross-motions are purely legal,[15] this

10. Between 1793 and 1822 the statutory policy embodied in the 1790 Nonintercourse Act was carried forward without major change. HANDBOOK 110 n. 388. It was then codified from the Act of June 30, 1834. *Id.* (citations omitted).

11. As plaintiff recognizes, without this concession, the validity of her own title would be in question. *See Thompson II*, 15 F.3d at 250.

12. In fact, so secondary is this argument that it is not specifically mentioned anywhere in plaintiff Thompson's complaint. Despite that omission, because the parties have both addressed this alternative argument (the County quite extensively), and in keeping with the spirit of liberal pleading rules, the court will also consider this alternative argument by plaintiff.

13. For a general discussion of summary judgment principles, see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Elec., Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

14. *See* Pl. Memo. at 3; Plaintiff's Reply Memorandum in Support of her Motion for Summary Judgment and in Opposition to Defendants' Cross–Motion for Summary Judgment ("Pl. Reply") at 2; and Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross–Motion for Summary Judgment Dismissing Plaintiff's Complaint ("Def. Memo.") at 5.

15. *See United States v. Burns*, 725 F.Supp. 116, 128 (N.D.N.Y.1989) (McCurn, C.J.) ("[T]he question of whether the St. Regis Reservation is itself Indian country as that term is defined in 18 U.S.C. § 1151 is a question of law to be determined by this court."); *see also United States v. Cook*, 922 F.2d 1026, 1031 (2d Cir.1991) (cita-

case is ripe for summary judgment. *See Linea Area Nacional de Chile, S.A. v. Meissner,*. 65 F.3d 1034, 1039 (2nd Cir.1995).

## II. *"Indian country"*

■ In its memorandum of law, the County took the position that because plaintiff Thompson's property is alienable,[16] *a fortiori,* it is taxable; it is that simple. During oral argument, the County significantly retreated from that position, however, agreeing with plaintiff that the threshold issue for the court's determination is whether the approximately sixty-eight acres which she owns in fee simple [17] is located within Indian country as defined in 18 U.S.C. § 1151.[18] "Indian country," as Congress has defined that phrase, encompasses three separate categories: (a) "Indian reservation[s];" (b) "dependent Indian communities;" and (c) "Indian allotment[s]." 18 U.S.C. § 1151 (West 1984). Although this definition is found in the criminal code, the Supreme Court has made clear that it governs for purposes of establishing civil as well as criminal jurisdiction over Indian matters. *See Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 453, n. 2, 115 S.Ct. 2214, 2217 n.2, 132 L.Ed.2d 400 (1995); *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207 n. 5, 107 S.Ct. 1083, 1088 n. 5, 94 L.Ed.2d 244 (1987); *DeCoteau v. District County Court,* 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 1084 n. 2, 43 L.Ed.2d 300 (1975).

From the outset, the issue which has divided the parties is whether the Reservation boundaries were diminished by the 1824 and 1825 conveyance agreements, thereby removing plaintiff Thompson's property from the statutory definition of Indian country found in section 1151(a). Thus far, the diminishment issue has dominated this litigation. Given the Second Circuit's pronouncement in *Cook,* however, that "the St. Regis tribe is a dependent community[,]" and hence Indian country in accordance with section 1151(b),[19] the court will first address plaintiff's alternative argument that "[i]t is established in this Circuit that the St. Regis Indian Reservation is Indian country." [20] Pl. Memo. at 10.

### A. *Dependent Indian Community*

In arguing that it is the law of this Circuit that the St. Regis tribe is a dependent Indian community, plaintiff heavily relies upon two cases with which this court is intimately familiar—*Burns* and *Cook.* In the former, this court held that the "St. Regis reservation is Indian country for purposes of [18 U.S.C. § 1151] ." 725 F.Supp. at 129.

For two reasons, the County asserts that *Burns* does not require this court to find that the St. Regis Reservation qualifies as Indian country. First, the Reservation boundaries were not at issue in *Burns,* as they are here. Second, the *Burns* defendants "admitted... that the *indictment* alleges that gambling activity took place on the reservation." [21] 725 F.Supp. at 129 (emphasis added). Basically, the court agrees with the County's position.

tions omitted) ("*Determinations of whether the site of an offense is Indian country have been held to be for the court alone.*").

16. Although there is very little upon which the parties agree, they do agree that there are no restraints on the alienation of plaintiff's property.

17. *See* Pl. Undisputed Facts at ¶ 5 (citation omitted).

18. *See* Tr. at 10–11; and Tr. at 25.

19. *Cook,* 922 F.2d at 1031 (citing *United States v. Sandoval,* 231 U.S. 28, 47–48, 34 S.Ct. 1, 6–7, 58 L.Ed. 107 (1913)).

20. As further support for her view that it is established within this Circuit that the St. Regis tribe is a dependent Indian community, plaintiff Thompson relies upon *Burns, supra.* As will be seen, though, in *Burns* this court did not consider the possibility that the St. Regis Reservation was a dependent Indian community. That jurisdictional theory did not emerge until trial, and then, again, in the alternative when the case was appealed. *See Cook,* 922 F.2d at 1030–31. Therefore, *Burns* is not germane to a discussion of the dependent Indian community definition of Indian country.

21. Actually, the County somewhat mischaracterizes the defendants' admission in *Burns.* According to the County, the *Burns* defendants admitted "that their actions had occurred within the boundaries of the St. Regis Reservation[.]" Def. Memo. at 29. As set forth above, though, the defendants' admission in *Burns* was narrower than that.

At first glance, *Burns* might appear to compel the conclusion that plaintiff Thompson's property meets the statutory definition of Indian country found in section 1151(b). Closer examination of *Burns* reveals, however, that that case is not dispositive of the Indian country issue here. The *Burns* defendants were charged with various gambling offenses. They moved to dismiss the indictment because, among other reasons, the St. Regis Reservation is not Indian country for purposes of prosecution under 15 U.S.C. § 1175.[22] There is no mention in *Burns* as to which subpart of section 1151 the government contended supported a finding that the St. Regis Reservation qualified as Indian country under that statute. Addressing the motion to dismiss the indictment in *Burns*, this court did not discuss the possibility that the St. Regis Reservation constituted Indian country because it was a dependent Indian community in accordance with section 1151(b).[23] Instead, the court focused on the reservation status of the St. Regis tribe. In so doing, relying in part upon the 1796 Treaty, the court rejected defendants' "rather unique proposition" that "a portion of the reservation, though by treaty located within the State of New York, is somehow not within the jurisdiction of the United States." *Id.* Conspicuously absent from *Burns*, however, is any mention of the 1824 and 1825 conveyance agreements, and the possibility that the 1796 Reservation boundaries had been diminished by the same. Nor was there an issue as to whether the gambling offenses occurred in lands which were part of the supposedly diminished portion of the Reservation.

Moreover, as previously mentioned, the defendants in *Burns* admitted that the indictment charged them with gambling activities which took place within the St. Regis Reservation. That admission is particularly signif-

icant because "land within the limits of any Indian reservation" qualifies as Indian country pursuant to section 1151(a). Therefore, by admitting that the indictment charged them with gambling activities on the Reservation, the *Burns* defendants conceded that the crimes with which they were charged occurred within Indian country—a jurisdictional prerequisite to that prosecution. Even without more, that admission was sufficient to satisfy the Indian country element of the charged offenses in *Burns*. Given that in *Burns* this court did not have occasion to address the issue of the possible diminishment of the St. Regis Reservation boundaries, and because the defendants therein conceded that the indictment charged them with crimes which occurred within Indian country, the court refuses to apply the *Burns* holding as to the Indian country of the St. Regis Reservation here, where the Indian country issue arises in a vastly different context.

■ As just discussed, the court is unwilling to find that plaintiff Thompson's property is Indian country on the basis of *Burns*. That does not mean, however, that the court disagrees altogether with plaintiff's law of the Circuit argument. In *Cook*,[24] upon which plaintiff also focuses to support this argument, members of the St. Regis Tribe were convicted in this court of various gambling offenses. On appeal they raised several issues, including a challenge to the district court's finding that it had subject matter jurisdiction over that prosecution because the charged gambling offenses occurred within Indian country. In affirming the defendants' convictions, the Second Circuit held, as previously noted, that "there was ample evidence from which [the district court] properly could conclude that the St. Regis tribe is a dependent community."[25] *Cook*, 922 F.2d at 1031

22. That statute reads, in pertinent part, as follows:

It shall be unlawful to manufacture, recondition, repair, sell, transport, possess, or use any gambling device... *within Indian country as defined in section 1151 of Title 18....*
15 U.S.C. § 1175 (West 1997) (emphasis added).

23. Evidence supporting that contention was not before the court until the trial was later conduct-

ed before Judge Van Graafeiland, sitting by designation. *See Cook*, 922 F.2d at 1031.

24. The *Cook* appeal originated from *Burns*.

25. Because the record before it convinced the Second Circuit that the St. Regis Tribe is a dependent Indian community, that Court did not resolve the government's alternative argument, which was that the St. Regis Tribe is within an Indian reservation—the first definition of Indian

(citing *Sandoval*, 231 U.S. at 47–48, 34 S.Ct. at 6–7, 58 L.Ed. 107). More specifically, the Court observed that as evidence that the St. Regis tribe is a dependent Indian community, the district court had before it the 1796 Treaty, which, in the words of the Second Circuit "established a six-mile tract of land for the occupancy of the St. Regis Indians[,]" as well as testimony from a Bureau of Indian Affairs ("BIA") employee that that area is inhabited by approximately 3,000 St. Regis Mohawk Indians, and that the tribe is federally recognized. *Id.* (citation omitted). That BIA employee further testified that "[t]he BIA provides the St. Regis tribe with monies for education, housing and training programs, social services and the administration of the tribal government[,]" and the BIA guarantees loans to both the tribe and its individual members, and, "[f]inally, the BIA is involved in the planning and funding of roads within the reservation and is charged with maintaining the integrity of the lands and resources." *Id.* Taken together, this evidence persuaded the Second Circuit that the district court did not err in finding that the St. Regis tribe is a dependent Indian community.

*Cook* was not a unanimous decision, however. For a host of reasons, Senior District Judge Lasker dissented, stating "that the evidence below was insufficient as a matter of law to establish that the St. Regis Mohawk tribe is a 'dependent Indian community.' " *Id .* at 1037. First of all, Judge Lasker disagreed with the majority's assumption that *Sandoval*[26] justified a finding that the St. Regis tribe is a dependent Indian commu-

nity, reasoning that *Sandoval* preceded the enactment of the gambling statute under which the *Cook* defendants were convicted, and thus "is of limited value as a guide to the interpretation of the term 'dependent Indian community' as that term is used in the statute." *Id.* Second, from Judge Lasker's viewpoint, "the definition of 'dependent Indian community' offered by the *Sandoval* court is too vague to be useful[]" because that Court did "not provide guidelines as to what extent of government involvement is necessary to render a community 'dependent.' " *Id.* at 1037–38. Finally, Judge Lasker questioned the relevancy of *Sandoval* because of what he termed "the outmoded assumptions about Native American peoples upon which [that] opinion is based. . . ." *Id.* at 1038.

As an additional basis for disagreeing with the majority, Judge Lasker pointed out that none of the four cases cited by the majority, in his opinion, supported a dependent Indian community finding in *Cook*. For example, Judge Lasker characterized *United States v. Martine*, 442 F.2d 1022 (10th Cir.1971), as "merely describ[ing] the general nature of the evidence received by the trial court to determine whether the community in question was dependent without any specific reference to what that evidence demonstrated objectively." *Id.* at 1038. Likewise, *State of Alaska v. Native Village of Venetie*, 856 F.2d 1384 (9th Cir.1988) ("*Venetie I* "), was not particularly helpful to the majority's position because "the Court of Appeals concluded that the factual record below was insufficient to reach a conclusion regarding dependency."[27]

country enumerated in section 1151. *See Cook* 922 F.2d at 1031.

**26.** *Sandoval* involved the authority of the federal government to enforce its laws governing the introduction of liquor into Indian country on the Pueblo lands in New Mexico. In *Sandoval*, Congress had explicitly stated that the Pueblo lands were Indian country. 231 U.S. at 37, 34 S.Ct. at 2 (internal quotations omitted) ("Indian country . . . shall . . . include all lands now owned or occupied by the Pueblo Indians of New Mexico") ("[T]he terms 'Indian' and 'Indian country' shall include the Pueblo Indians of New Mexico and the lands now occupied by them."). Therefore, the only issue before the Supreme Court was whether that express congressional designation could be given effect. Answering in the affirma-

tive, the Court emphasized that "the questions whether, to what extent, and for what time [Indians] shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts." *Id.* at 46, 34 S.Ct. at 6 (citations omitted). Because Congress, having expressly said so, intended that "the lands then owned or occupied by the Pueblo Indians should be deemed and treated as Indian country," the Court held· that the federal laws applied to those Pueblo lands. *Id.* at 37–38, 34 S.Ct. at 2.

**27.** Litigation of the *Venetie* case has been extremely protracted. The multi-factor inquiry suggested by the Ninth Circuit in *Venetie I* is currently being challenged in the Supreme

*Id.* The other two cases cited by the *Cook* majority, *United States v. Azure*, 801 F.2d 336 (8th Cir.1986) and *United States v. Levesque*, 681 F.2d 75 (1st Cir.1982), were both factually distinguishable from *Cook*, in Judge Lasker's view. The former was distinguishable because the federal government retained title to the land upon which the tribe lived, whereas in *Cook* the St. Regis tribe owned the land. Judge Lasker similarly distinguished *Levesque* on the grounds that the tribe there received three million dollars annually in federal aid, but in *Cook* there was no evidence as to how much funding (federal or otherwise) the St. Regis tribe received.

Judge Lasker did agree with one aspect of the majority opinion in *Cook*, though, and that is the three factors which must be considered in deciding whether a particular Indian tribe is a dependent community. Those factors are "(1) the nature of the area; (2) the relationship of the inhabitants in the area to the Indian tribes and the federal government; and (3) the established practice of government agencies toward that area." *Cook*, 922 F.2d at 1038. But, in Judge Lasker's view, the proffered evidence in that regard did "not by itself establish that the St. Regis tribe is a dependent community." *Id.* Moreover, according to Judge Lasker, "[t]he mere existence of federal programs which benefit a given community does not establish that that community's relationship with the federal government can be characterized as one of dependency." *Id.* Lastly, he suggested that "to determine whether the St. Regis

tribe relies on the federal government for support, it would seem to be necessary to ascertain at the very least what percentage of the tribe's expenses federal funding covers and how many and what percentage of tribe members actually participate in or benefit from federal programs." *Id.* Such evidence was not before the *Cook* Court.

Judge Lasker's thoughtful dissent gives this court pause. Not only does his dissent expose some weaknesses in the majority's reasoning in *Cook*, but the court is also somewhat hesitant to adopt wholesale the majority's position therein, knowing that, as previously alluded to,[28] presently before the Supreme Court is the issue, broadly stated, of what factors courts should evaluate in determining whether land is Indian country within the meaning of section 1151(b). Nonetheless, as a district court within the Second Circuit, this court is constrained to follow the law of this Circuit, which, in this case, means the law as articulated by the majority, and not the dissent, in *Cook*.[29] After *Cook*, then, this court is compelled to find that plaintiff's property is Indian country within the meaning of section 1151, not because it is within an Indian reservation, but because it is located within what the Second Circuit has already determined is a dependent Indian community.[30]

## B. *Indian Reservation*

Obviously, the court could end its analysis of the Indian country issue at this juncture. However, because the parties have concen-

Court. *See Yukon Flats School Dist., v. Venetie Tribal Gov't*, 101 F.3d 1286, 1292 (9th Cir.1996), *cert. granted*, —— U.S. ——, 117 S.Ct. 2478, 138 L.Ed. 2987 (1997).

28. *See* n. 27, *supra.*

29. *Cf. Bass v. Coughlin*, 800 F.Supp. 1066, 1071 (N.D.N.Y.1991), *aff'd on other grounds* 976 F.2d 98 (2d Cir.1992) ("When the Court of Appeals announces a principle of law for this circuit, it remains the law until the case is overruled or reversed."); and *Pyke v. Cuomo*, 92–CV–554, 1995 WL 694624, at *6 (N.D.N.Y. Nov.22, 1995) (and cases cited therein) (This district court "is obligated to follow the law of the Second Circuit, in which [it] sits.").

30. Almost as an afterthought, the County suggests that it should not be bound, among other things, by the Second Circuit's dependent Indian

community finding in *Cook* because the County was not a party to that action, nor in privity with a party thereto. Of course, this is true; but plaintiff Thompson is not contending that the County should be precluded from relitigating the dependent Indian community issue on *res judicata* and/or collateral estoppel grounds. Rather, plaintiff is doing nothing more than relying upon the well-settled doctrine of *stare decisis*, which, in the present case, mandates a result consistent with *Cook. See Vasquez v. Hillery*, 474 U.S. 254, 264, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986) ("Today's decision is supported, ..., by the important doctrine of *stare decisis*, the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion.").

**120**

trated so heavily upon the reservation diminishment issue, and because the court has some doubts as to whether *Cook* will retain its precedential value after *Venetie,* the court, too, will go on to consider plaintiff's primary argument, which is that her property constitutes Indian country as defined in section 1151(a) because it is within the St. Regis Reservation as created by the 1796 Treaty. Plaintiff Thompson maintains that her property is "within the limits" of the St. Regis Reservation because the boundaries of the same have never been diminished by an act of Congress since the Reservation's creation in 1796.—On the other hand, the County asserts that the 1824 and 1825 conveyance agreements were sufficient to diminish the original Reservation so that plaintiff's property no longer is located within the boundaries of that Reservation. *See, e.g., Hagen v. Utah,* 510 U.S. 399, 401, 114 S.Ct. 958, 960, 127 L.Ed.2d 252 (1994) ("If the reservation has been diminished, then [the land] within the historical boundaries of the reservation, is not in 'Indian country.'"); *Solem v. Bartlett,* 465 U.S. 463, 467, 104 S.Ct. 1161, 1164, 79 L.Ed.2d 443 (1984) (same); and *DeCoteau,* 420 U.S. at 427 & n. 2, 95 S.Ct. at 1084 & n. 2, 43 L.Ed.2d 300 (same).

To support her position that an act of Congress is the exclusive means by which reservation boundaries may be diminished, plaintiff Thompson heavily relies upon *Solem.* Addressing the issue of reservation diminishment, the *Solem* Court reiterated that the "first and governing principle" in such a case "is that only Congress can divest a reservation of its land and diminish its boundaries." 465 U.S. at 470, 104 S.Ct. at 1166. "Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Id.* (footnote omitted) (citing *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94–95, 54 L.Ed. 195 (1909)). Next, the Court emphasized, as it had before, that there must be an expression of clear Congressional "'intent ... to change ... boundaries' before diminishment will be found." *Id.* (citing *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 615, 97 S.Ct. 1361, 1377, 51 L.Ed.2d 660 (1977)). Thus, congressional intent is critical to the determination of whether a given reservation has been diminished.

The Supreme Court has identified three distinct factors which are probative of congressional intent to diminish a reservation: (1) statutory language, (2) historical context, and (3) subsequent treatment of the land. *Hagen,* 510 U.S. at 410–11, 114 S.Ct. at 965 (quoting *Solem,* 465 U.S. at 470–471, 104 S.Ct. at 1166–1167). Throughout this analysis, plaintiff Thompson stresses that any ambiguities are to be resolved in favor of the Indians,[31] and diminishment "will not be lightly inferred[]"[32] because "traditional solicitude for Indian rights favors the survival of reservation boundaries in the face of the opening up of reservation lands to settlement and entry by non-Indians."[33] *See Thompson II,* 15 F.3d at 250 n. 4 (quoting *Pittsburg & Midway Coal Min. Co. v. Yazzie,* 909 F.2d 1387, 1393 (10th Cir.1990)).

Guided by the three-part diminishment test set forth in *Solem,* plaintiff Thompson contends that this court cannot find, as a

**31.** *Hagen,* 510 U.S. at 410–11, 114 S.Ct. at 965 (citations omitted).

**32.** *Solem,* 465 U.S. at 470, 472, 104 S.Ct. at 1166, 1167.

**33.** In *Thompson II,* the Second Circuit, while recognizing the general proposition that diminishment will not be lightly inferred, pointedly stated, "[w]e offer no view, ..., as to the application of this proposition in this case." *Thompson II,* 15 F.3d at 250 n. 4. The Court in *Thompson II* did, though, question the applicability of the diminishment presumption in this context where "reservation property was conveyed from the tribe to a sovereign state, as opposed to "the opening up of Indian lands by the federal government to homesteading by private, non-Indian settlers[.]" *Id.* at 250–51 n. 4.

As will become apparent, in the present case it is not necessary for the court to invoke the rules of construction urged by plaintiff Thompson because such rules do not dictate a finding that reservation boundaries were not diminished where, as here, there is clear intent to the contrary. *See Rosebud Sioux Tribe,* 430 U.S. at 587, 97 S.Ct. at 1363. Therefore, the court will leave for another day the issue of whether the presumption against reservation diminishment applies to conveyances, such as those at issue herein, from a tribe to a sovereign state.

matter of law, that the 1796 Reservation boundaries were diminished because, first and foremost, there has been no congressional act diminishing the St. Regis Reservation. The County retorts that a congressional act is not the only means by which a reservation may be diminished. Just as historically reservations were created by a variety of means, such as executive order, treaty, and agreement,[34] so too, argues the County, were reservations diminished by a variety of means; and here the St. Regis Reservation was diminished by the 1824 and 1825 conveyance agreements.

■■■ For different reasons, the court is unwilling to readily embrace either of those arguments. The court does agree with the general proposition, which the County advances, that a reservation may be diminished through means other than a congressional act. Plaintiff Thompson's assertion to the contrary fails to take into account that the United States Constitution dictates that treaties, like federal legislation, are both the supreme law of the land. The Constitution could not be more clear in that regard: "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, *shall* be the supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2 (emphasis added). Thus, "[u]nder our constitutional system, treaties and statutes are *both* the supreme law of the land, and the constitution sets forth no order of precedence to differentiate between them." *U.S. v. Palestine Liberation Organization,* 695 F.Supp. 1456, 1465 (S.D.N.Y.1988) (emphasis added) (citation omitted). In other words, "[b]etween treaty law and federal statutory law there is thought to be a virtual equivalence." MARK W. JANIS, AN INTRODUCTION TO INTERNATIONAL LAW 89 (2d ed.1993); *see also Foster v. Nielson,* 27 U.S. (2 Rct.) 253, 314, 2 Pet. 253, 7 L.Ed. 415 (1829) (Marshal, C.J.) (a treaty, ratified pursuant to constitutional procedures, must "be regarded in courts of justice as equivalent to an act of the legislature," if self-executing in form).

This fundamental principle governing the relationship between treaties and federal statutes controls regardless of whether the treaty is one between the United States and a foreign country or whether it is a treaty with an Indian tribe. *Cf. United States v. State Tax Com'n of State of Miss.,* 505 F.2d 633, 639 (5th Cir.1974) ("[T]hese Indian treaties, when ratified by the Senate, assumed equal status with the Constitution itself as part of the 'supreme Law of the Land.'"). That is so because, as with other treaties, "[t]reaties with Indian tribes are contemplated by" article II of the Constitution, granting the President the power to make treaties with the advice and consent of the Senate, and also by the supremacy clause. HANDBOOK 62 (citation omitted). As the foregoing demonstrates, acceptance of plaintiff's premise that reservation diminishment can only be accomplished through a congressional act would run afoul of the Constitution.[35] Thus,

---

**34.** *See generally* AMERICAN INDIAN TREATIES 312–313 (compilation of manner in which 162 reservations of 1890 were created—by executive order; executive order under authority of act of Congress; act of Congress; treaty, with boundaries defined or enlarged by executive order; and treaty or agreement and act of Congress).

**35.** As previously discussed, Congress statutorily ended treaty making with the Indians in 1871. HANDBOOK 515 (footnote omitted). Thus, there was a relatively narrow time frame in the history of this country during which Indian reservations were created or diminished, or both, by treaties. That fact standing alone does not, however, undermine the County's argument that the 1824 and 1825 agreements diminished the St. Regis Reservation, because when Congress ended the practice of treaty making with the Indians, it expressly provided that "no obligation of any

treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired." 16 Stat. 544, 566, now codified as 25 U.S.C. § 71. Accordingly, assuming for the moment that the 1824 and 1825 agreements were "lawfully made and ratified," they would remain in full force and effect, unless, of course, they were explicitly abrogated by Congress. *See South Dakota v. Bourland,* 508 U.S. 679, 687–689, 113 S.Ct. 2309, 2315–2316, 124 L.Ed.2d 606 (1993) (Congress has the power to unilaterally abrogate treaty rights granted by treaty, although usually it must clearly express its intent to do so.); *Lone Wolf v. Hitchcock,* 187 U.S. 553–566, 23 S.Ct. 216–222, 47 L.Ed. 299 (1903) (same). There is no indication in this record that Congress abrogated either the 1824 or the 1825 agreements. Therefore, again, assuming *arguendo* the treaty status of both of those agreements, seemingly they would super-

the court is unwilling to find, as plaintiff so strongly urges, that a congressional act is the exclusive means by which an Indian reservation may be diminished. *See United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 501, 33 S.Ct. 811, 812, 57 L.Ed. 1299 (1913) (acknowledging that a treaty negotiated in 1867 eliminated a considerable portion of a tract of land previously reserved in a treaty negotiated in 1864 and substituted a new tract of land, which came to be known as the White Earth Reservation).[36]

■ By the same token, however, given the current state of the record, the court is unwilling to find that the 1824 and 1825 conveyance agreements, standing alone, diminished the boundaries of the St. Regis Reservation. The court is reluctant to make such a finding because, as previously alluded to, on this record it is doubtful whether the 1824 and 1825 conveyance agreements are, in fact, treaties entered into in accordance with article II of the Constitution. Neither of those agreements have any of the attributes of an article II treaty.

This record is silent as to whether there was any type of congressional authority for either the 1824 or 1825 conveyance agreements. Nor is there any evidence showing that the President of the United States ever submitted either of those agreements to the Senate for constitutional action. Likewise, there also is no evidence showing that the Senate ever passed a resolution approving

either of those two conveyance agreements. In contrast to the 1796 Treaty,[37] also absent from this record is any indication that the President proclaimed the 1824 and 1825 agreements to be federal treaties. In short, there is nothing before this court showing that either the 1824 or the 1825 conveyance agreements was entered into with federal authority. In light of the foregoing, even though the court agrees with the County that reservation boundaries can be diminished by treaty, the court declines to find that the 1824 and 1825 agreements, which do not have any of the indicia of federal treaties, superseded the 1796 Treaty, which clearly does have all the earmarks of an article II treaty.

■ Equally troublesome is plaintiff Thompson's insistence that the appropriate analytical framework here is the three-part test employed by the Supreme Court in reservation diminishment cases involving surplus land acts, such as the Indian General Allotment Act of 1887 ("Dawes Act").[38] 24 Stat. 388 (1887), codified at 25 U.S.C. § 331 *et seq.* Without exception, in each of the cases plaintiff Thompson cites to support her argument that this court should apply the three-part test outlined in *Solem*, the issue was whether Congress intended through the enactment of surplus land acts to diminish or terminate reservation boundaries.[39] If this court was confronted with interpretation of a surplus land act, such as the Dawes Act, then it would not hesitate to focus upon the exis-

sede the 1796 Treaty and diminish the Reservation boundaries.

**36.** *Cf. Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir.1981) (citing *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 103–104, 69 S.Ct. 968, 979, 93 L.Ed. 1231 (1949)) ("Congress can create a reservation, reserve rights to the Indians, and dispose of the lands of the United States by statute as well as by treaty.").

**37.** *See* Complaint, exh. C thereto; 1796 Treaty, reprinted in Kappler 45.

**38.** The United States' policy of dealing with the Indians has been anything but constant. After Congress ended formal treaty making with the Indians in 1871, the United States entered into what is sometimes referred to as the allotment period. This era of forced assimilation spanned the years 1871–1934. During this time, with

"[t]he idea . . . of lur[ing] nomadic hunting tribes away from their communal village existence and [of] encourag[ing] a sedentary, rural agricultural life on separate allotments[,]" AMERICAN INDIAN LAW 148, "members of a tribe . . . received their individual allotments ("allotted lands") from the government, [and] the surplus land ("unallotted lands") could be sold to non-Indian settlers." *Yankton Sioux*, 99 F.3d at 1443. "Thus, Indian reservations were opened to non-Indian settlement for the first time." AMERICAN INDIAN LAW 149. However, "[c]ongressional policy later changed when it became clear in the first decades of the twentieth century that the allotment policy was failing." *Yankton Sioux*, 99 F.3d at 1444 (citations omitted).

**39.** *See, e.g., Hagen*, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252; *Solem*, 465 U.S. 463, 104 S.Ct. 1161; *DeCoteau*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300; and *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).

tence of congressional intent to diminish. Because this is not a surplus land act case, however, the court is reluctant to borrow an analytical framework derived exclusively from such cases and apply it here, where diminishment occurred, if at all, through the 1824 and 1825 conveyance agreements. Nonetheless, in the absence of any other suggested analytical framework,[40] and because there is authority, albeit scant, for engaging in a surplus land act analysis outside that context,[41] the court will proceed to examine the 1824 and 1825 conveyance agreements employing the three-part test set forth by the *Solem* Court. The court will do so, even though, as will be seen, the surplus land act factors are not readily adaptable to a reservation diminishment claim based upon conveyance agreements.

### 1. Language

Starting with the "most probative evidence"[42] of intent to diminish, the court first must carefully examine the language of the conveyance agreements.[43] Both the 1824 and 1825 agreements unequivocally state that the St. Regis Tribe "covenanted and agreed" to "sell and hereby convey" certain land to the State of New York. Peebles Aff., exhs. A and B thereto. In *Mattz*, the Supreme Court offered several examples of "clear language of express termination" of a reservation, such as " 'the Smith River reservation is hereby discontinued' [,]" and an 1892 Act

"providing that the North Half of the Colville Indian Reservation, 'the same being a portion of the Colville Indian Reservation ... be, and is hereby, vacated and restored to the public domain[.]' " 412 U.S. at 504 n. 22, 93 S.Ct. at 2258 n. 22 (quoting 15 Stat. 221 (1868) and 27 Stat. 63 (1892)). Likewise, in *DeCoteau*, the Supreme Court found that the Lake Traverse Indian Reservation had been terminated because, *inter alia*, in an 1889 agreement between the Siseton–Wahpeton Tribe and the United States, which was later ratified by Congress, the Indians agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title and interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians ....' " 420 U.S. at 445, 95 S.Ct. at 1093 (quoting Agreement of 1881, Art. I, 26 Stat. 1036 (footnote omitted)).

Certainly the cession language contained in the 1824 and 1825 agreements is not as expansive as that just quoted. Nonetheless, because the language of those conveyance agreements goes much farther than making unallotted lands on the reservation available to non-Indian settlers,[44] the court is convinced that the cession language contained therein is indicative of an intent to diminish the St. Regis Reservation.

In addition to the language of cession, the manner in which a tribe is compensated is

---

**40.** Not only did the parties fail to offer a viable alternative analysis, but they compounded that oversight by also failing to specifically address the *Solem* factors, other than the existence of congressional intent.

**41.** See *Confed. Tribes of Chehalis v. State of Wash.*, 96 F.3d 334 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997) (examining the three *Solem* factors, the Ninth Circuit found that the Chehalis Reservation boundaries were not diminished by an executive order restoring to the public domain all but 471 acres of that Reservation); *Yazzie*, 909 F.2d at 1404 n. 23 (10th Cir.1990) (Court assumed that congressional intent governed the reservation diminishment issue, despite the fact that there the reservation was neither created nor terminated by congressional action, but by executive order).

**42.** *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166.

**43.** To the extent plaintiff Thompson is urging this court to examine whether the Nonintercourse

Act, in and of itself, evinces Congressional intent to diminish the St. Regis Reservation, the court declines to do so. After all, the County's diminishment argument is not based upon that Act, but rather, it is based upon the conveyance agreements. Therefore, it stands to reason that in ascertaining the existence of an intent to diminish the St. Regis Reservation, the court should focus upon those agreements. Moreover, as plaintiff herself recognizes, the Nonintercourse Act purports to address only the issue of title, and not jurisdictional issues. See Pl. Reply at 19–20 n. 13 (citations omitted). Consequently, that Act is not particularly relevant to the separate and distinct issue of intent to diminish jurisdictional boundaries.

**44.** *See, e.g., Mattz*, 412 U.S. at 497, 93 S.Ct. at 2254; and *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 356, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962).

relevant to a determination of diminishment. Here, both agreements directed payment to the St. Regis Tribe of a sum certain ($1,750.00 in the 1824 agreement and $2,100 in the 1825 agreement). Payment of a sum certain,[45] coupled with the unequivocal language in the 1824 and 1825 agreements signifying an intent to diminish, creates "an almost insurmountable presumption"[46] that the intent here was to diminish the Reservation. *See DeCoteau,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (reservation terminated were there was express language regarding termination, payment of a sum-certain and tribal consent to the agreement); *but see Rosebud Sioux Tribe,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (reservation terminated where there was arguably language regarding termination, but no payment of a sum certain and no tribal consent).

### 2. *Surrounding Circumstances*

The circumstances surrounding, in this case, the execution of the conveyance agreements is the second factor relevant to the diminishment inquiry. *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166. In examining the surrounding circumstances of a given transaction, the manner in which that transaction was negotiated and its legislative history are highly probative of intent to diminish. *Id.* Obviously, there is no legislative history for the court to examine here. (The lack of such history highlights the difficulty in applying the analytical framework of a surplus land act to the present case, where the issue of continued reservation status arises in a vastly different factual context.) · In any event, although not specifically identified by the Supreme Court as such, whether the tribe consented to a given transaction also seems to factor into that Court's analysis of the surrounding circumstances. For example, in *DeCouteau,* where the Court found that the reservation had been terminated, it high-

lighted the fact that the 1891 Act which it was construing was "not a unilateral action by congress but the ratification of a previously negotiated agreement, to which a tribal majority consented." 420 U.S. at 448, 95 S.Ct. at 1094; *but see Rosebud Sioux Tribe,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (no tribal consent, but reservation still disestablished).

In the present case, there is no direct proof that a majority of the St. Regis Tribe consented to the agreements. On the other hand, there is nothing suggesting that a majority of the Tribe did not consent. Thus, because it is impossible to discern tribal consent from this record, this factor does not carry any weight in the court's analysis of whether the 1824 and 1825 agreements evinced an intent to diminish the St. Regis Reservation.

Even though there is no direct proof on this record as to the circumstances surrounding the execution of the 1824 and 1825 agreements, the historical context in which those agreements were executed further persuades the court that they diminished the Reservation's original jurisdictional boundaries. When those agreements were negotiated, Congress had not yet uncoupled title and reservation status. That did not happen until 1948 when Congress statutorily clarified and expanded the definition of Indian country, unlinking Indian title and reservation status. Consequently, when the 1824 and 1825 agreements were executed, the signatories thereto could not have intended to extinguish title to the land described therein, while at the same time retaining the reservation status of that land. Indeed, the opposite appears more likely; that is that the parties to the conveyance agreements then understood that by extinguishing Indian title to the property, they were also diminishing the Reservation's jurisdictional boundaries.

---

**45.** The 1824 agreement also included a provision for an annual payment "forever hereafter" of sixty dollars. Peebles Aff., exh. A thereto. That additional payment does not, however, undermine a finding of intent to diminish because it stands in stark contrast to the situation where no intent to terminate a reservation is found because payment is contingent upon future sales of the property. *See, e.g., Mattz,* 412 U.S. 481, 93

S.Ct. 2245, 37 L.Ed.2d 92 (reservation not terminated where there was no express language regarding termination and no payment of a sum certain); *Seymour,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (same).

**46.** *Solem,* 465 U.S. at 470–71, 104 S.Ct. at 1166 (citation omitted).

Thus, despite the fact that the evidence before this court as to the circumstances surrounding execution of the 1824 and 1825 conveyance agreements admittedly is scant, mainly given the historical context in which these agreements were executed, the court finds that this factor too supports a finding of intent to diminish the St. Regis Reservation.

### 3. Subsequent Treatment

Subsequent treatment of the opened reservation land is the third factor which the court must consider in ascertaining intent to diminish. *Solem*, 465 U.S. at 471, 104 S.Ct. at 1166. This element does not factor into the court's analysis, however, because the record is silent as to how the approximately 1,840 acres of land which was the subject of the 1824 and 1825 conveyance agreements was treated by Congress, the BIA, and local judicial authorities after 1825. Nor is there evidence in the record as to who actually moved on to that conveyed land and whether the area has retained its Indian character. Therefore, the subsequent treatment of the land which was the subject of the 1824 and 1825 agreements does not figure into the court's analysis of the diminishment issue herein.

At the end of the day, then, the court is left with three factors which argue in favor of a finding of reservation diminishment: (1) the unequivocal cession language found in the 1824 and 1825 agreements; (2) the fact that the St. Regis were paid a sum certain for the land which was the subject of those agreements; and (3) historically speaking, the signatories to those conveyance agreements could not have intended to extinguish title, and still retain the reservation status of the land because such a concept was unheard of until many years later when, in 1948, Congress statutorily clarified the definition of Indian country, uncoupled Indian title and reservation status. *See Solem*, 465 U.S. at 468, 104 S.Ct. at 1164 ("The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century. Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest....."). Taken to-

gether, these factors persuade the court that by entering into the 1824 and 1825 conveyance agreements the parties thereto intended to, and did, diminish the original 1796 Reservation. This finding of diminishment is bolstered by the fact, mentioned earlier, that cession language in combination with payment of a sum certain creates "an almost insurmountable presumption" in favor of diminishment. *See Solem*, 465 U.S. at 470–71, 104 S.Ct. at 1166 (citation omitted). Plaintiff Thompson offers nothing to overcome this strong presumption.

As should be evident by now, the court is persuaded that the St. Regis Reservation as originally established by the 1796 Treaty was diminished by the subsequent conveyance agreements, and as a result plaintiff Thompson's property no longer lies within the jurisdictional boundaries of that Reservation. Therefore, her property is not Indian country within the meaning of 18 U.S.C. § 1151(a). As previously explained, though, because plaintiff's property is part of a dependent Indian community (the St. Regis tribe), the court is forced to conclude that her property does qualify as Indian country, not because it is within an Indian reservation, but rather, because it is within what the Second Circuit has previously recognized as a dependent Indian community.

### III. Taxation Authority

Having determined that plaintiff Thompson's property constitutes Indian country under section 1151(b), the issue becomes whether the County has the authority to impose its *ad valorem* tax on that property. Plaintiff argues that the County cannot tax her Indian country property because, similar to the issue of the Indian country status of that property, there is no act of Congress authorizing such taxation. In response, the County takes the position that it does not need to rely upon a congressional act as the basis for its taxing authority because the Tribe ceded jurisdiction in the 1824 and 1825 conveyance agreements, and thus the County is entitled to tax plaintiff's property, even in the absence of a congressional act.

Both parties rely heavily upon the Supreme Court's decision in *County of Yakima*

v. Yakima Indian Nation, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), to support their respective arguments regarding the County's taxation authority, or lack thereof, as the case may be. In *Yakima Nation*, Justice Scalia writing for the majority, reiterated, as plaintiff Thompson is quick to note, that "[i]n the area of state taxation," the Supreme Court has adopted a "categorical approach: '[A]bsent cession of jurisdiction *or* other federal statutes permitting,' ..., a State is without power to tax reservation lands and reservation Indians." *Id.* at 257–58, 112 S.Ct. at 688 (emphasis added) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)).[47] Furthermore, Supreme Court jurisprudence in the area of state taxation of Indians "reveal[s] a consistent practice of declining to find that Congress has authorized state taxation unless it has made its intention to do so unmistakably clear." *Id.* (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985)) (other citation omitted). Relying upon this interpretive rule, in *Yakima Nation* the Court examined the language of two statutes, the Indian Reorganization Act of 1934 and the Dawes Act, to discern the requisite congressional intent. In what one scholar has described as a "tour de force of strict textualism," [48] the Court found such intent with respect to state taxation of tribal land within the Yakima Reservation, but not with respect to the excise tax which the state sought to collect on the sale of such property.

There is no clear consensus as to how *Yakima Nation* should be interpreted. The Ninth Circuit has interpreted *Yakima Nation* as focusing on alienability of land, rather than its method of allotment, as a basis for taxation. Rejecting the Tribe's argument that reservation land should be treated dif-

ferently for state taxation purposes simply because it is patented under a treaty, rather than under the GAA, the Ninth Circuit tersely "conclude[d] ... that the land's alienable status determines its taxability." *Lummi Indian Tribe v. Whatcom County*, 5 F.3d 1355, 1357 (9th Cir.1993) (citing *Yakima Nation*, 502 U.S. at 257–65, 112 S.Ct. at 688–691). On the other hand, the Sixth and Eighth Circuits have held that alienability, alone, is not dispositive of taxability. *Leech Lake Band of Chippewa Indians v. Cass County*, 108 F.3d 820, 825–830 (8th Cir.1997), *cert. granted*, — U.S. —, 118 S.Ct. 361, 139 L.Ed.2d 281, — U.S. —, 118 S.Ct. 361, 139 L.Ed.2d 285 (1997); [49] and *United States v. Michigan*, 106 F.3d 130, 133–34 (6th Cir.1997), *petition for cert. filed*, 66 USLW 3085 (June 30, 1997).

Here, even though the County is unable to point to a federal statute permitting it to tax plaintiff's Indian country property, it asserts that it has the power to do so because the St. Regis tribe ceded jurisdiction when it entered into the 1824 and 1825 conveyance agreements, and thus the County is entitled to tax plaintiff's property, despite its Indian country status. The court disagrees.

It is true, that the Supreme Court has indicated that by ceding jurisdiction, in essence, Indians consent to taxation by the State or local government. The Court seems to be giving lipservice to that notion, however, because what the Supreme Court's Indian taxation cases make clear is that, as set forth above, in order to determine whether a state or local government has the power to tax Indian lands, a court must find unmistakably clear congressional intent to allow such taxation. Here, unlike the Dawes

47. *See generally Cabazon Band of Mission Indians*, 480 U.S. at 215–16 n. 17, 107 S.Ct. at 1091 n. 17 (stating, in *dicta*, a *"per se* rule" that state taxation "of Indian lands and tribal members" is barred unless Congress expressly permits it).

48. David Williams, *Legitimation and Statutory Interpretation: Conquest, Consent, and Community in Federal Indian Law*, 80 Virg. L. Rev. 403, 431 (1994).

49. The Supreme Court's recent grant of *certiorari* in *Leech Lake*, to consider whether "[u]nder

*Yakima County v. Yakima Indian Nation*, ...land originally patented by U.S. government, and subsequently reacquired in fee simple by Indian band, [is] subject to state and local government taxation if it remains freely alienable, irrespective of statute or treaty under which it was originally conveyed[,]" strongly suggests that the Supreme Court is cognizant of the varying interpretations which courts have afforded *Yakima Nation* in the intervening years.

Act, the conveyance agreements do not demonstrate congressional intent to authorize local governments, such as the County, to tax plaintiff's property. There is absolutely no mention of taxation in either of the conveyance agreements. *See United States v. Michigan*, 106 F.3d at 130. Nor has the County come forth with any evidence which shows such intent. *See id.* Thus, even if the St. Regis did cede jurisdiction of the original Reservation boundaries by entering into the 1824 and 1825 conveyance agreements, the court cannot ignore the fact that on this record there is no unmistakably clear congressional intent to allow taxation of plaintiff's Indian country property. Moreover, the Supreme Court's "cases make clear that a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; it is enough that the member live in 'Indian country.' Congress has defined Indian country broadly to include formal and informal reservations, *dependent Indian communities*, and Indian allotments, whether restricted or held in trust by the United States." *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123–25, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (citation omitted) (emphasis added). Applying that rule to the present case, because the court is convinced that plaintiff Thompson's property qualifies as Indian country, it is, *a fortiori*, outside the taxing jurisdiction of the County.

To conclude, in the court's opinion, the 1796 St. Regis Reservation was diminished by the 1824 and 1825 conveyance agreements. However, that finding is not dispositive of the Indian country status of plaintiff Thompson's property because the Second Circuit has already determined that the St. Regis constitute a dependent Indian community, and hence satisfy the statutory definition of Indian country found in section 1151(b). And because plaintiff's property comes within the statutory definition of Indian country, it is not taxable by the County, especially in the absence of express congressional intent allowing such taxation. Consequently, the court hereby grants plaintiff Dana Leigh Thompson's motion for summary judgment, finding that her property is located within Indian country, as that phrase is defined in 18 U.S.C. § 1151(b), and, as such, is immune from the defendant County's *ad valorem* tax. Conversely, the court hereby denies the crossmotion for summary judgment by the defendants, the County of Franklin and William Hughes, Treasurer. The Clerk of the Court is directed to enter Judgment accordingly.

IT IS SO ORDERED.