Dana Leigh THOMPSON, Plaintiff,

v.

COUNTY OF FRANKLIN; and William A. Hughes, Treasurer of Franklin County, Defendants.

No. 92–CV–1258 NPM DNH.

United States District Court, N.D. New York.

Dec. 26, 2000.

**146**

Arlinda F. Locklear, Jefferson, MD, for Plaintiff.

White & Case, New York, Syracuse, NY, Dwight A. Healy, of counsel, for Defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

The present case is *not* unfamiliar to this court. The deceptively simple issue of whether defendant, County of Franklin,[1] may tax real property owned in fee simple by plaintiff Dana Leigh Thompson, who at least until June 27, 1997, was an enrolled member of the St. Regis Mohawk Indian Tribe ("the St. Regis") has engendered much litigation over the past eight years. During that time, the court has issued four separate decisions involving various aspects of this tax dispute. *See Thompson v. County of Franklin,* No. 92–CV–1258, 1992 WL 554369 (N.D.N.Y. Nov. 30, 1992), *rev'd Thompson v. County of Franklin,* 15 F.3d 245 (2d Cir.1994), *on remand to* No. 92–CV–1258, 1996 WL 341988 (N.D.N.Y. June 18, 1996); *Thompson v. County of Franklin,* 987 F.Supp. 111 (N.D.N.Y.1997) (*"Thompson IV"*); and *Thompson v. County of Franklin,* 180 F.R.D. 216 (N.D.N.Y.1998) (*"Thompson V"*). The court assumes familiarity with these prior decisions. To place the present motion in context, however, and especially because in recent years the procedural history of this case has been anything but straightforward, it is necessary to recount some of that history before delving into the substantive issues which the County's present motion raises.

### *Background*

#### *I.  Thompson IV*

In *Thompson IV* this court was faced with two, related issues: (1) whether plaintiff's real property is located within "Indian country" as that term is defined in 18 U.S.C. § 1151; and (2) whether nonetheless the County has the authority to tax that property. The court answered the first inquiry in the positive, and the second in the negative. To resolve the first issue, this court looked to *United States v. Cook,* 922 F.2d 1026 (2d Cir.1991), wherein the Second Circuit found that "there was ample evidence from which [the district court] properly could conclude that the St. Regis tribe is a dependent community." *Id.* at 1031 (citing *U.S. v. Sandoval,* 231 U.S. 28, 47–48, 34 S.Ct. 1, 6–7, 58 L.Ed. 107 (1913)). *Cook* was the foundation for this court's dependent Indian community finding in *Thompson IV,* but at the same time the court expressed "some doubts as to whether *Cook* w[ould] retain its precedential value[.]" *See Thompson IV,* 987 F.Supp. at 120. Those doubts arose in part from Judge Lasker's "thoughtful dissent[,]" which "expose[d] some weaknesses in the majority's reasoning in *Cook* [.]" *Id.* at 119. This court was also somewhat hesitant to "adopt wholesale the majority's opinion" in *Cook,* being fully aware that at that time "[t]he multi-factor inquiry suggested by the Ninth Circuit in *Venetie [II,* 101 F.3d 1286 (9th Cir.1996) ] [wa]s ... being challenged in the Supreme Court[,]" and potentially that decision could impact upon the meaning of "dependent Indian commu-

---

1.  Also named as a defendant herein is Bryon A. Varin, the County's treasurer. These de-

fendants will be collectively referred to throughout as "the County."

nities" as that term is employed in section 1151. *See id.* at 118 n. 27 (citation omitted). Nevertheless, because this court was "constrained to follow the law of this Circuit," in the form of the *Cook* majority, it was also "compelled to find that plaintiff[ ] [Thompson's] property [wa]s Indian country within the meaning of section 1151[ (b) ], ..., because it is located within what the Second Circuit has already determined is a dependent Indian community." *See id.* at 119 (footnote omitted).

Given the court's uncertainty as to the continuing vitality of *Cook* in light of *Venetie III*, and the parties' heavy emphasis upon the issue of reservation diminishment, the court went on to discuss the diminishment issue. The court held that because the St. Regis Reservation was diminished by conveyances subsequent to the 1796 Treaty which created that Reservation, plaintiff's property was no longer within the Reservation's jurisdictional boundaries; and hence it was not Indian country within the meaning of section 1151*(a)*. *See id.* at 125. However, based upon its finding that plaintiff Thompson's property is located within a dependent Indian community, this court ultimately held that her property "is *not* taxable by the County, especially in the absence of express congressional intent allowing such taxation." *See id.* at 127 (emphasis added). Accordingly, this court granted summary judgment in favor of plaintiff and conversely it denied the County's cross-motion for summary judgment. On December 8, 1997, judgment was entered in accordance therewith. *See* Doc. # 70.

## II. Procedural

The County timely filed, in the Second Circuit, a notice of appeal from this court's judgment in *Thompson IV*. *See* Affidavit of Dwight A. Healy (Oct. 27, 1998) ("Healy Aff."), at 3, ¶ 6 and exh. 10 thereto. During the pendency of that appeal, there was some discussion among counsel as to a possible stay of same until the Supreme Court rendered its decisions in two then pending cases—*Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998) ("*Venetie III*"); and *Cass County, Minnesota v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998). *See* Affidavit of Arlinda Locklear in Opposition to Defendants' Motion for Relief from Judgment (Nov. 25, 1998) ("Locklear Aff.") at 1, ¶ 4. The County advocated a stay of its appeal based upon its belief that those two cases might have some bearing on the present case. *See* Locklear Aff. at 1, ¶ 4.

*Venetie III* and *Cass County* involve completely different legal issues. Broadly stated, the issue in *Venetie III* was the meaning of the phrase "dependent Indian communities" as used in the statutory definition of "Indian country." *See* 18 U.S.C. § 1151 (West 2000). The Supreme Court in *Cass County* was faced with the separate and distinct issue of "whether state and local governments may tax reservation land that was made alienable by Congress and sold to non-Indians by the Federal Government, but was later repurchased by a tribe." *See Cass County*, 524 U.S. at 106, 118 S.Ct. at 1906. Before the parties could agree on the terms of the proposed stay, on February 25, 1998, the Supreme Court announced its decision in *Venetie III*. *See* Locklear Aff. at 1, ¶ 5.

Shortly thereafter, on March 6, 1998, the parties filed a Stipulation and Order with the Second Circuit wherein they agreed to withdraw that appeal "without prejudice to reinstatement of [same] within 30 days of issuance" of the Supreme Court's decision in *Cass County*. *See* Healy Aff., exh. 11 thereto at 1; *see also* Locklear Aff. at 1, ¶ 6. In the meantime, the County became aware that Mrs. Thompson had sent a letter to the St. Regis Tribe wherein, in the County's view, she disavowed her membership in the Tribe. After learning of that letter, on April 29, 1998, the County moved this court for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(2), authorizing such relief based upon "newly dis-

covered evidence," i.e. the Thompson tribal resignation letter. In that motion, the County sought "to modify th[e] judgment to declare that plaintiff . . . is not immune from its ad valorem tax effective as of" her resignation date. *See Thompson V,* 180 F.R.D. at 218 (internal quotation marks and citation omitted). The *sole* basis for that motion was Mrs. Thompson's purported resignation from the St. Regis Tribe.

During the interim, while the County's Rule 60(b)(2) motion was pending, on June 8, 1998, the Supreme Court issued its decision in *Cass County.* Just three days later, the County filed its reply memorandum in connection with the original Rule 60(b) motion. *See* Locklear Aff. at 2, ¶ 8. Despite the fact that by then *Cass County* had been decided, the County did not mention that decision in its reply. *See id.* at 2, ¶ 8. Approximately a month later, on July 2, 1998, the County reinstated its appeal in the Second Circuit in accordance with the terms of the earlier stipulation—i.e., within 30 days of the Supreme Court's issuance of the *Cass County* decision. *See id.* at 2, ¶ 9; and Healy Aff., exh. 12 thereto.

On July 30, 1998, agreeing with the County, in *Thompson V* this court held that plaintiff's resignation letter constituted "newly discovered evidence" which warranted granting the County's motion for relief from judgment. *See Thompson V,* 180 F.R.D. at 222. However, because the County's appeal was still pending at that time, the court found that it had no jurisdiction to entertain the Rule 60(b)(2) motion. *See id.* at 219–220. By the same token, though, the court did indicate "its willingness to grant th[at] . . . motion[,]" but concluded that it would not actually grant the same until the case was remanded from the Second Circuit. *See id.* at 226. On August 27, 1998, because plaintiff would not consent to a remand, *see* Healy Aff. at 4, ¶ 10, the County filed a remand motion in the Second Circuit, which it granted slightly more than a month later. *See id.,* exh. 14 thereto. Upon remand, the County promptly sought court inter-

vention, requesting a briefing schedule for the County's proposed second motion for reconsideration. *See id.,* exh. 15 thereto (Letter of Dwight A. Healy to Court (10/2/98), at 1). The basis for that request was that from the County's viewpoint *Venetie III* and *Cass County* amounted to a "fundamental change in law since judgment was entered[.]" *See id.* at 3. Thus, the County further requested that the court *defer modification of the judgment* until the County made a second motion for reconsideration—on the basis of those two Supreme Court decisions. In other words, on remand the County asserts that not only should the court modify the judgment to reflect plaintiff's tax exempt status following her resignation from the Tribe, but the County maintains that "it is also . . . appropriate to reconsider whether Plaintiff's land was taxable *while* [she] was a member of the St. Regis . . . Tribe." *See id.*

Plaintiff strenuously objected to what she perceived as an attempt by the County to vastly broaden the scope of the remand. Attempting to factually distinguish *Venetie III* and *Cass County,* plaintiff Thompson disagreed with the County's assertion that those two decisions "constitute[ ] a significant change in the law governing the outcome of [this] case." Healy Aff., exh. 16 thereto (Letter from Locklear to Court of 10/5/98, at 1.) Rather than shifting the focus to *Venetie III* and *Cass County,* plaintiff took the position that any further proceedings in this court should be "limit[ed] . . . to the single issue for which defendants sought remand—i.e., the status of Mrs. Thompson vis a vis the St. Regis . . . Tribe." *See id.,* exh. 16 thereto at 2. In this regard, plaintiff "propose[d] a limited evidentiary hearing" wherein, among other things, she intended to "show that she terminated her relationship with the governing body of the St. Regis . . . Tribe, as recognized by the United States, [but] *not* with the Tribe itself." *Id.* (emphasis added).

Upon consideration of the parties' respective positions as outlined above, the court allowed the County to bring the current Rule 60(b) motion based upon "a *claimed* intervening change in controlling law; that is, the Supreme Court's recent decisions in [*Venetie III*]; and [*Cass County*]...." Healy Aff., exh. 17 thereto (emphasis added) (Letter from Court to Counsel of Record (10/7/98) at 1.) After receiving the court's permission, on October 28, 1998, the County filed this motion seeking relief from judgment based upon three separate provisions of Rule 60(b). However, Rule 60(b)(2), the basis for *Thompson IV*, is *not* one of the bases for the current motion. Consequently there are in effect two separate Rule 60(b) motions currently pending before the court. The first is what the court will refer to as the "original" reconsideration motion, which was based upon "newly discovered evidence," *i.e.*, plaintiff's alleged change in Tribal status. The second is the more recently filed motion for relief under Rule 60(b)(1), (5) and (6), due to the alleged intervening change in controlling law which supposedly resulted from the Supreme Court's decisions in *Venetie III* and *Cass County*.

### Discussion

The basis for the County's original Rule 60(b) motion, as well as the court's analysis of same are fully set forth in *Thompson V*, and there is no need to reiterate the same herein. This second Rule 60(b) motion is entirely different from the original, however. Now the County is arguing that a change in controlling law, which purportedly occurred as a result of the Supreme Court's rulings in *Venetie III* and *Cass County*, entitles it to relief from judgment under any one of three separate subsections of Fed.R.Civ.P. 60(b)—sections one, five and six—subsections which did *not* form the basis for the County's original motion.

Both from a substantive and from a procedural standpoint, plaintiff Thompson challenges this second reconsideration motion by the County. Substantively, she disagrees that either *Venetie III*, *Cass County*, or both mark a change in the controlling law for purposes of obtaining relief from judgment under Rule 60(b). Procedurally, plaintiff Thompson reasons that *Venetie III* and *Cass County* could have been included as additional or alternative bases for the County's original reconsideration motion; but, for whatever reason, it made a "strategic decision" not to proceed in this manner. *See* Pl. Memo. at 5. In that regard, plaintiff points out that *Venetie III* easily could have been incorporated in the County's original Rule 60(b) motion because that case was decided almost two full months *before* the filing of that motion. Yet, the County made no mention of *Venetie III* in its original Rule 60(b) motion. Furthermore, plaintiff observes that *Cass County* was decided three days before the filing date of the County's reply memorandum submitted in support of its original motion. By implication, then, plaintiff contends that the County also could have included *Cass County* as a further basis for its original motion. For all of these reasons, simply stated, plaintiff Thompson contends that the County is in the wrong court; it should be arguing the applicability of *Cass County* and *Venetie III* in the Second Circuit, not here, in this district court. As far as plaintiff Thompson is concerned, this motion "is simply an appeal masked in Rule 60(b) language." *See Brown v. De Fillipis*, No. 87 CIV. 3498, 1989 WL 161532, at *2 (S.D.N.Y. Dec.22, 1989).

The County disagrees. Not only does it differ with plaintiff Thompson as to the impact of *Venetie III* and *Cass County* upon the present litigation, but, in sharp contrast to her, the County asserts that it is entirely proper for it to be arguing the applicability of those cases now, on this Rule 60(b) motion, rather than on appeal in the Second Circuit. Although not stated in precisely these terms, the County's rationale is that as long as this court must,

pursuant to the Second Circuit's mandate, consider whether to modify the final judgment due to Mrs. Thompson's changed Tribal membership status, it also should consider whether this claimed change in law warrants modification of the previously entered judgment. Indeed, proceeding in this way best serves the interests of "judicial economy" according to the County. *See* Def. Memo. at 9.

### I. *Propriety of Second Rule 60(b) Motion*

■ When the court allowed the County to file the present motion, it did not articulate its reasons for so doing. By allowing the filing of such a motion, however, the court impliedly adopted the view that the County's prior Rule 60(b) motion did not bar it from pursuing this second motion for similar relief. Because the issue of the propriety of this second, independent motion for relief from judgment continues to divide the parties, the court will briefly address the same.

For now the court will put aside the issue of whether any of the three subsections of Rule 60(b) upon which the County is relying is an appropriate procedural vehicle for the present motion. Instead, the court will focus on whether it is permissible for the County to bring this second Rule 60(b) motion in the first place. At first glance there is some appeal to plaintiff's contention that this court is strictly limited by the terms of the Second Circuit's remand; that is, it may *only* grant the County relief from judgment, if at all, based upon plaintiffs' change in Tribal membership status. Although the County is eager for that relief, it wants more.

In accordance with *Thompson V* and the Second Circuit's mandate on remand, granting the County's original motion would result in amendment of the judgment. Rather than being completely exempt from real property *ad valorem* taxation, the judgment would reflect that plaintiff is liable for such taxes from the date of her resignation letter to the St.

Regis Tribe (June 27, 1997) onward. As this court has previously recognized, plaintiff's tax liability in this respect arises from the fact that "clearly" she exercised her right to sever her relationship with the St. Regis Tribe, and her related admission that if the court makes a finding of her resignation, as it did, then she would be "liable to the county for *ad valorem* taxes after that date." *See Thompson V,* 180 F.R.D. at 223–226. Amendment of the judgment to reflect the foregoing, however, still leaves open the issue of whether plaintiff Thompson also should be held liable for *ad valorem* taxes *prior* to her resignation date.

Upon remand, clearly this court has jurisdiction to grant the County's original Rule 60(b) motion. *Cf. U.S. v. Rodgers,* 101 F.3d 247, 251 (2d Cir.1996) (internal quotation marks and citation omitted) ("[a] district court ... regain[s] jurisdiction u[pon] issuance of the mandate by the clerk of the court of appeals"). Indeed, such action is precisely what this court contemplated in *Thompson V,* and what the Second Circuit endorsed by granting the County's motion seeking "*amendment of judgment pursuant* to [*Thompson V* ], stating intent of District Court to grant Defendants' motion for relief from judgment." *See* Healy Aff., exh. 14 thereto (emphasis added). Thus, if in accordance with *Thompson V* and the Second Circuit's mandate, this court were to grant the County's original motion, then as plaintiff herself concedes, she would be liable for *ad valorem* taxes after the date of her resignation date from the Tribe, *i.e.,* June 27, 1997. *See Thompson V,* 180 F.R.D. at 225–226.

Plaintiff Thompson still, however, would *not* be liable for *ad valorem* taxes *prior* to her resignation date. She would be tax exempt for that time based upon this court's finding in *Thompson IV* that the St. Regis tribe is a dependent Indian community, and hence "Indian country." *See Thompson IV,* 987 F.Supp. at 125–127. If the court were to end its analysis at this

point and *not* consider the County's second reconsideration motion, it would order amendment of the December 8, 1997 judgment to reflect the foregoing. That amended judgment would be entered and the time to appeal would then commence running anew from that date. *See Minter v. Boone,* No. 89 CIV. 3076, 1989 WL 74404, at *2 (S.D.N.Y. June 29, 1989) (citations omitted) ("The granting of a Rule 60(b) motion and the entering of a new judgment would generally renew a party's time to appeal from the new judgment.")

Given that the court has clearly signaled its intent to grant the County's original Rule 60(b)(2) motion, and modify the judgment to indicate "that plaintiff is liable to the County for *ad valorem* taxes after June 27, 1997[,]" *see Thompson V,* 180 F.R.D. at 226, and the fact that the Second Circuit remanded this case for precisely that purpose, *see* Healy Aff., exh. 14 thereto, at a minimum the judgment in this case will have to be amended in that respect. Consequently, it makes eminent good sense for the court also to consider at this time the County's second Rule 60(b) motion based upon an alleged change of law.

The court is fully aware that Rule 60(b) is not intended as a substitute for a direct appeal. *See Polanco v. United States,* Nos. 99Civ.5739, 94CR.453, 2000 WL 1346726, at *1 (citation omitted) (S.D.N.Y. Sept. 19, 2000). By the same token however it makes little sense, especially in terms of judicial economy, for the court to modify the judgment in accordance with *Thompson V,* but disregard the possibility that the judgment should be further modified in light of *Venetie III* or *Cass County* or both. *Cf. HRI, Inc. v. Environmental Protection Agency,* 198 F.3d 1224, 1248 (10th Cir.2000) (because the district court had not ruled "on the application of the set-aside and superintendence tests required by *Venetie,*" Tenth Circuit was "not in an appropriate position to resolve the dispute itself at th[a]t time[ ]"); *State v. Reels,* No. CR 96232040, 1998 WL 440832, at *3 n. 4 & *25–*26 (Conn.Super. July

27, 1998) (because the Supreme Court had not yet issued *Venetie III,* court did not decide the dependent Indian community issue based upon that case, but in the "epilogue" of a written opinion rendered after *Venetie,* court, *sua sponte,* applied the enunciated test therein). Addressing all of the possible bases for which the County argues entitles it to Rule 60(b) relief means that upon the anticipated appeal the Second Circuit will have before it all of the parties' respective arguments pertaining to Rule 60(b) relief and the court's rulings thereon. Perhaps this will eliminate one step in the appellate process.

## II. Intervening Change in Controlling Law?

As should be readily apparent by now, underlying each of the County's arguments herein for Rule 60(b) relief is the assumption that *Venetie III* and *Cass County* amount to an intervening change in controlling law. First the court will consider the validity of that assumption because if it disagrees with the County on this point, then obviously there is no need to address the host of procedural issues which the County's most recent reconsideration motion raises. On the other hand, if *Venetie III* or *Cass County,* or both, mark a change in the applicable law, then of course it will be necessary to determine whether any of the three clauses of Rule 60(b) upon which the County is relying is the proper procedural vehicle for this particular motion.

### A. Legal Standard

Plaintiff Thompson contends that to mark a change so as to justify relief from judgment, the intervening law must be "directly contrary" to the law as applied by this court in *Thompson IV. See* Pl. Memo. at 4. She further contends that because it did not explicitly mention *Cook,* the Supreme Court in *Venetie III* did not "overrule[ ]" *Cook. See id.* at 8. Likewise, plaintiff Thompson reasons that *Venetie III* did not overrule *Cook* because there is no

mention in *Venetie III* of *United States v. Martine,* 442 F.2d 1022 (10th Cir.1971), one of several cases which the *Cook* Court cited as justification for conducting a three-fold inquiry into the dependent Indian community status of the St. Regis. *See Cook,* 922 F.2d at 1031.

On the other hand, the County asserts that a change in the law did occur here because in *Venetie III* the Supreme Court implicitly overruled *Cook* in terms of the test to be applied in deciding what constitutes a dependent Indian community. Furthermore, because *Cook* was the sole basis for this court's previous finding that the St. Regis tribe qualifies as a dependent Indian community, *see Thompson IV,* 987 F.Supp. at 119, the County argues that this court must revisit that finding in light of the test articulated by the Supreme Court in *Venetie III.*

In evaluating whether a given case has resulted in a change in the controlling law, it is necessary to examine the claimed change in law to "determine what effect, if any, [it] has on the law to be applied in this case." *See Richman v. W.L. Gore & Associates, Inc.,* 988 F.Supp. 753, 755 (S.D.N.Y.1997). As will be more fully discussed below, a comparison of *Venetie III* and *Cook* reveals that although the Supreme Court did not specifically mention *Cook* nor *Martine,* clearly *Venetie III* resulted in a change in the law in terms of analyzing whether a given group falls within the meaning of a dependent Indian community as that phrase is used in 18 U.S.C. § 1151(b). As will be more fully discussed below, application of the *Venetie III* test here yields a different result than this court reached in *Thompson IV,* applying the *Cook* Court's rationale. Moreover, also as will be seen, despite plaintiff's attempts to demonstrate otherwise, the Second Circuit did not employ the *Venetie III* standard in *Cook.* To summarize, careful examination of the dependent Indian community body of law persuades this court

that it must revisit the issue of whether the St. Regis tribe is a dependent Indian community, and in so doing it must apply the standard enunciated by the Supreme Court in *Venetie III.*

### B. *Venetie III*

To fully understand the significance of *Venetie III,* it is necessary to briefly examine the state of the law prior thereto. Enacted in 1948 section 1151 defines "Indian country" in three separate ways: (a) a "reservation"; (b) "dependent Indian communities"; and (c) "Indian allotments." [2] *See* 18 U.S.C. § 1151(a), (b), and (c) (West 2000). Stating the obvious, then, a dependent Indian community under section 1151(b) "refer[s] to a *limited* category of reservation lands that are *neither* reservations nor allotments[.]" *See Venetie III,* 522 U.S. at 527, 118 S.Ct. at 952 (emphasis added). From the enactment of this Indian country statute until 1998, the Supreme Court "had [not] had ... occasion to interpret the term 'dependent Indian communities.'" *See Venetie III,* 522 U.S. at 527, 118 S.Ct. at 953. Due to this lack of guidance, lower courts were employing different tests for determining how to define this limited category of Indian lands. *See Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1545 n. 15 (10th Cir.1995) (recognizing the application of two competing tests to determine the existence of a dependent Indian community because until *Venetie III* the Supreme Court "ha[d] never adopted its own test .... and ha[d] denied certiorari in cases applying both of the competing versions[ ]"); *see also State v. Dick,* 127 N.M. 382, 981 P.2d 796 (N.M.Ct.App.1999) ("Prior to *Venetie [III],* the test for determining whether a 'dependent Indian community' existed varied by jurisdiction.")

Relying upon *Martine,* "one of the earliest cases on the 'dependent Indian commu-

---

**2.** Plaintiff Thompson has never claimed that her property is Indian country because it

qualifies as an Indian allotment under section (c).

nity' concept[,]"[3] the Second Circuit in *Cook* identified three factors to be used in assessing the dependent Indian community status of a given tribe. "To determine whether a particular Indian tribe is a dependent Indian community, it is necessary to examine the (1) nature of the area; (2) the relationship of the inhabitants in the area to the Indian tribes and the federal government; and (3) the established practice of government agencies toward that area." *See Cook*, 922 F.2d at 1031 (citations omitted). Following the First Circuit's lead, in *Cook* the Second Circuit stated that in ascertaining the existence of a dependent Indian community, the focus is upon " 'communities which ... are both 'Indian' in character and federally dependent.' " *Id.* at 1030 (quoting *United States v. Levesque*, 681 F.2d 75, 77 (1st Cir.1982)). The Second Circuit was not alone in employing this three-factor test. *See Cook*, 922 F.2d at 1030 (and cases cited therein). Other Circuits employed a similar, but not identical four factor test. *See, e.g., Watchman*, 52 F.3d at 1545 (and cases cited therein).

The Ninth Circuit engaged in a more detailed analysis though. "Broadly" construing the federal set-aside and superintendence elements, the Ninth Circuit majority in *Venetie II* held that in addition to the three factors which the court considered in *Cook*, the two federal set-aside and superintendent elements should be "informed by[:] ... the degree of federal ownership of and control over the area; ... the degree of cohesiveness of the area inhabitants; and ... the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples." *See id.* at 1294. In the Ninth Circuit's view, this "more textured six-factor inquiry" was in keeping with the "functional approach to Indian country" suggested in prior Supreme Court cases. *See Venetie II*, 101 F.3d at 1293.

Writing for a unanimous Supreme Court, Justice Thomas expressly disapproved of this "textured six-factor balancing test." *See Venetie III*, 522 U.S. at 531 n. 7, 118 S.Ct. at 954 n. 7 (internal quotation marks and citation omitted). Instead, the Court unambiguously held that there are two requirements which must be met before a tribe's land will be deemed "dependent Indian community." *See id.* at 527, 118 S.Ct. at 953. First, those lands "must have been set aside by the Federal Government for the use of the Indians as Indian land; [and second,] they must be under federal superintendence." *Id.* at 527, 118 S.Ct. at 953. The underlying purpose of the federal set-aside requirement is two-fold: (1) it "ensures that the land in question is occupied by an 'Indian community' "[;] and (2) it "reflects the fact that because Congress has plenary power over Indian affairs, ..., some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country." *See id.* at 531 and n. 6, 118 S.Ct. at 955 and n. 6. A finding of federal superintendence "guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." *Id.* at 531, 118 S.Ct. at 955.

Justice Thomas acknowledged that, like the Supreme Court, the Ninth Circuit in *Venetie II* had concluded that section 1151(b) imposes two federal requirements (set-aside and superintendence), but he took that Court to task for "defin[ing] those requirements far differently," than did the Supreme Court. *Id.* at 531 n. 7, 118 S.Ct. at 955 n. 7. The Ninth Circuit's reliance upon three factors in particular— " 'the nature of the area'; 'the relationship of the area inhabitants to Indian tribes and the federal government'; and 'the degree

---

**3.** *See State v. Reels*, No. CR 96232040, 1998 WL 440832, at *15 (Conn.Super. July 27, 1998).

of cohesiveness of the area inhabitants[ ]'"—drew strong criticism from the Supreme Court because those factors were "*extremely* far removed" from the federal set-aside and superintendence requirements which it held were a prerequisite to a finding of a dependent Indian community. The Supreme Court further chastised the Ninth Circuit's balancing approach in *Venetie II* because it improperly "reduced the federal ... requirements to *mere considerations.*" *See id.* (emphasis added). The *Venetie III* Court also found the Ninth Circuit's approach flawed because it resulted in the three "extremely far removed" factors set forth above being "accorded ... virtually the same weight as other, *more relevant*" factors, i.e. federal set-aside and superintendence. *See id.* (emphasis added) (citation omitted).

Applying the two-prong federal set-aside and superintendence test to the record before it, the Supreme Court held that "[t]he Tribe's ... lands d[id] not satisfy either of these requirements." *See id.* at 532, 118 S.Ct. at 955. As to federal set-aside, the Court explained that the federal statute at issue, the Alaska Native Claims Settlement Act (ANCSA), "far from designating Alaskan lands for Indian use, revoked the existing Venetie Reservation[.]" *Id.* Furthermore, because ANCSA authorized the transfer of reservation lands "to private, state-chartered Native corporations, without any restraints on alienation or significant use restrictions," by its "very design," the Supreme Court found that "Congress contemplated that non-Natives could own the former Venetie Reservation, and ... the Tribe [wa]s free to use it for non-Indian purposes[.]" *Id.* at 532–33, 118 S.Ct. at 955.

The Court found it "[e]qually clear[ ] [that] ANCSA ended federal superintendence over the Tribe's lands." *Id.* at 533, 118 S.Ct. at 955. In reaching this conclusion, the Supreme Court found significant the fact that ANCSA's stated purpose was "to avoid a 'lengthy wardship or trusteeship.'" *Id.* at 533, 118 S.Ct. at 956 (quoting § 1601(b)). Furthermore, under ANCSA the land at issue was entitled to only limited federal protections, such as being "exempt from adverse possession claims, real property taxes and certain judgments[.]" *Id.* These "land-related protections," which the Supreme Court deemed "minimal," were not indicative of "active[ ]" federal control over the land at issue. *See id.* at 533 and 534, 118 S.Ct. at 956 (citations omitted). As will be seen, especially significant in terms of the present case is the Supreme Court's outright rejection in *Venetie III* of the Tribe's argument that federal superintendence could be shown "because the Federal Government provide[d] desperately needed health, social, welfare, and economic programs to the Tribe." *Id.* at 534, 118 S.Ct. at 956 (internal quotation marks and citation omitted).

As the foregoing discussion demonstrates, the Court in *Venetie III* "announced *for the first time* a two-part test for dependent Indian community[.]" *See United States v. Roberts,* 185 F.3d 1125, 1132 (10th Cir.1999) (emphasis added). That two-prong test marks a change in the controlling law in terms of the legal standard to be applied here. There are two fundamental distinctions between the dependent Indian community test applied by courts prior to *Venetie III*, including the *Cook* Court, and the test adopted by the Supreme Court. First of all, by focusing exclusively upon federal set-aside and federal superintendence, the Supreme Court undercut significantly the impact of other factors such as those which formed the basis for the *Cook* Court's finding that the St. Regis qualifies as a dependent Indian community. *See HRI, supra,* 198 F.3d at 1232 n. 3 ("presumably *Venetie [III]* reduces substantially the weight to be afforded" factors such as the "nature of the area, relationship of area inhabitants to Indian tribes and the federal government, ...."). Thus after *Venetie III*, in deciding whether a given tribe meets section 1151(b)'s definition of a dependent Indian community, clearly the federal require-

ments of set-aside and superintendence "take priority over other considerations." *See Dick,* 127 N.M. at 385, 981 P.2d at 799 (citing *Venetie III,* 522 U.S. at 531 n. 7, 118 S.Ct. at 955 n. 7). So, instead of six, or even three, there are now only two determinative factors—federal set-aside and superintendence. What is more, after *Venetie III,* factors other than federal set-aside and superintendence are so diminished in importance as to be practically meaningless, except perhaps to the extent that those other "extremely far removed" factors can be used to inform the analysis of the two federal requirements.

Second, undeniably *Venetie III* altered the focus of the federal superintendence inquiry. In *Venetie II,* agreeing with the district court, the Ninth Circuit majority unambiguously declared "that it is not land but *Indians* which *must be* under the *superintendence* of the *federal government.*" *Venetie II,* 101 F.3d at 1290 n. 1 (emphasis added) (internal quotation marks and citation omitted). Stressing that *federal superintendence* of *land* is the proper focus, the Supreme Court in *Venetie III* explained that focusing on the inhabitants "ignores our Indian country precedents, which indicate ... that it is the land in question, and not merely the Indian tribe inhabiting it, that must be under the superintendence of the Federal Government." *See Venetie III,* 522 U.S. at 530 n. 5, 118 S.Ct. at 954 n. 5 (citing, *inter alia, United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938)). Thus, as at least one other court has recognized, *Venetie III* "indicates a change in the focus of the 'dependent Indian community' analysis by shifting the emphasis from the inhabitants and their day-to-day relationship with the government to a land-based inquiry." *Dick,* 127 N.M. at 384, 981 P.2d at 798.

This court is not alone in finding that *Venetie III* altered the legal landscape in terms of whether a given tribe or Native group is a "dependent Indian community" under 18 U.S.C. § 1151(b). The Tenth Circuit described *Venetie III* as an "intervening clarification of the standards" for determining what constitutes a dependent Indian community under 18 U.S.C. § 1151(b). *See HRI,* 198 F.3d at 1248. In a similar vein, the Connecticut Superior Court characterized *Venetie III* as "the *now definitive* holding[ ]" in terms of the standard to be used for finding a dependent Indian community under 18 U.S.C. section 1151(b). *See Reels,* 1998 WL 440832, at *26 (emphasis added).

Plaintiff Thompson argues that despite the foregoing, there has been no change in the controlling law for purposes of the instant motion because the *Cook* Court did not rely upon the six factor test which the Supreme Court so heavily criticized in *Venetie III.* In fact, in an attempt to show the continuing vitality of *Cook,* plaintiff Thompson is taking the position that "the Supreme Court's dependent Indian community analysis in *Venetie [III]* is consistent with the Second Circuit's analysis in ... *Cook* [,]" and hence the court should deny the County's motion for relief from judgment. *See* Pl. Memo. at 7. This court disagrees. *Venetie III did* result in a change in controlling law, and *Cook* is *not* consistent with the dependent Indian community standard adopted by the Supreme Court in *Venetie III.*

Plaintiff's argument to the contrary ignores the fact that two of the three factors which the *Cook* Court examined—"the nature of the area" and the relationship of the inhabitants to the federal government—are two of the factors which the Supreme Court found to be "extremely far removed" from the dispositive factors of federal set-aside and superintendence. *See Venetie III,* 522 U.S. at 531 n. 5, 118 S.Ct. at 955 n. 7. Plaintiff's argument also ignores the fact, as will be more fully explained below, that in *Cook* the Second Circuit emphasized the relationship between the St. Regis themselves and the federal government—an approach which the Supreme Court expressly disavowed in

*Venetie III. See id.* at 530 n. 5, 118 S.Ct. at 954 n. 5.

### D. Application of Venetie III

 Keeping in mind that plaintiff Thompson has the burden of proof with respect to establishing dependent Indian community status here,[4] the court will turn to an application of the *Venetie III* test to the record as it is presently constituted.

Application of that two-prong test to the present record demonstrates that the St. Regis Tribe does not come within the ambit of section 1151(b)'s definition of a dependent Indian community.

### 1. Federal Set–Aside

Plaintiff Thompson asserts that *Cook* comports with *Venetie III*'s federal set-aside requirement because, as the Second Circuit noted, "the Treaty of 1796 between the United States, the State of New York and the St. Regis established a 'tract equal to six miles square . . . to be applied to the use of the Indians of the village of St. Regis . . .'" Despite plaintiff's assertions to the contrary, that reference was not an "explicit set-aside." Rather, the *Cook* Court merely noted the existence of that Treaty in the context of examining the "nature of [the] area," a factor which the *Venetie III* Court subsequently deemed tangential to other, "more relevant" factors. *Venetie III*, 522 U.S. at 531 n. 7, 118 S.Ct. at 955 n. 7. Thus, it cannot be said that the *Cook* Court recognized an "explicit set-aside."

Assuming for the sake of argument that the 1796 Treaty does comport with *Venetie III*'s federal set-aside requirement, plaintiff Thompson cannot necessarily avail herself of that Treaty and the *Cook* decision to establish the requisite federal set-aside here. As this court has previously recognized, the 1816 conveyances diminished the St. Regis Reservation to the extent that her property no longer lies within the

boundaries of the original 1796 reservation. *See Thompson IV*, 987 F.Supp. at 125. Thus, the County maintains that "plaintiff's land is no longer set apart 'for the use of the Indians as such.'" Def. Memo. at 13 (quoting *Venetie III*, 522 U.S. at 520, 118 S.Ct. at 954 n. 5). This court's recognition of the diminished 1796 reservation boundaries significantly undermine plaintiff's argument that the 1796 Treaty, as relied upon by the Second Circuit in *Cook*, establishes the necessary federal set-aside.

Furthermore, plaintiff has readily conceded that her land is alienable. *See* Healy Aff., exh. 8 thereto at 17; exh.1 thereto at ¶ 4; exh. 3 thereto at ¶ 5. There are no restrictions or limitations on the use of her property. Thus, like *Venetie III*, at any time plaintiff Thompson is free to convey her land to non-Indians, for a non-Indian purpose. Finally, the court cannot disregard the fact that plaintiff's land was not necessarily at issue in *Cook* because there the Second Circuit was concerned only with the 1796 Treaty reservation land; it did not take into account any possible subsequent diminishment of that land. To the extent *Cook* can be read as addressing the federal set-aside issue at all, it did so only in the context of the 1796 Reservation. Therefore, because this court has already indicated that the 1796 Reservation boundaries were diminished by subsequent conveyances, and because it has also indicated that plaintiff's property is no longer located within those original boundaries, *Cook* does not advance plaintiff's argument that there has been a showing of federal set-aside here.

Case law applying *Venetie III* is scant. Insofar as federal set-aside is concerned, however, one *post-Venetie III* case stands in stark contrast to the present case. In *Dick* the court held that "when congress set aside 'for the use of the Bureau of

---

**4.** *See Watchman,* 52 F.3d at 1546 (emphasis added) ("[T]he *Navajo Nation* has presented evidence to *satisfy its initial burden* of demonstrating [that] the . . . Mine is a *dependent Indian community*.'").

Indian Affairs [BIA][ ]' " certain lands, and when that congressional act expressly provided that it was " '[t]o make available *for Indian use* certain surplus property[,]' " the federal set-aside element was established. *See Dick*, 127 N.M. at 385, 981 P.2d at 799 (quoting Public Law 567) (emphasis added). The court also found that the federal set-aside requirement was met there because in *Dick* the act unambiguously stated that " '[t]itle to the land so transferred shall remain in the United States for the use of the [BIA][.]' " *Id.* at 386, 981 P.2d at 800 (quoting Public Law 567).

Admittedly, the 1796 Treaty provides, as the Second Circuit noted in *Cook*, that a "tract equal to six miles square" was "to be applied to the use of the Indians of the village of St. Regis". *See* Treaty of 1796, 7 Stat. 55. However, as discussed above, plaintiff Thompson's land no longer lies within that original six acre tract. What is more, there is nothing in the current record showing that *her land* has been set aside for Indian use. Indeed, the fact that plaintiff Thompson's property is freely alienable augurs strongly against a finding of Indian use. Plaintiff is free to sell her land to non-Indians and Indians alike. What is more, a non-Indian purchaser also is free to use plaintiff Thompson's land for a non-Indian purpose. For these reasons, as in *Venetie III*, this court "must conclude that the federal set-aside requirement is not met." *See Venetie III*, 522 U.S. at 533, 118 S.Ct. at 955 (citations omitted).

### 2. Federal Superintendence

Plaintiff Thompson fares no better with her argument that *Cook* is consistent with *Venetie III* in terms of demonstrating the requisite federal superintendence. As previously alluded to, the *Cook* Court focused upon the relationship the St. Regis people have with the federal government; it did not, as *Venetie III* requires, focus on the relationship between the federal government and the St. Regis land. For example, the *Cook* Court took note of the mo-

nies which the BIA provided to the St. Regis "for education, housing and training programs, social services and the administration of the tribal government." *See Cook*, 922 F.2d at 1030. Additionally, the Second Circuit observed that the BIA guaranteed loans to both the St. Regis tribe and to its individual members. *See id.* In *Venetie III*, however, the Supreme Court emphatically held that its "Indian country precedents ... do not suggest that the mere provision of desperately needed social programs can support a finding of Indian country." *See Venetie III*, 522 U.S. at 534, 118 S.Ct. at 956 (internal quotation marks omitted). Indeed, the Court characterized the provision of such benefits by the BIA as "mere[ ] forms of general federal aid[.]" *Id.* Thus, given that the *Cook* Court's analysis was based primarily upon the relationship of the federal government to the inhabitants of the land, as opposed to the land itself, *Cook* is not, in this court's opinion, "consistent" with *Venetie III*. In fact, *Cook* is the exact opposite of *Venetie III* in terms of its approach to the federal superintendence element.

To be sure, there is mention in *Cook* of the federal government's relationship to the land at issue therein. More specifically, as further support for its conclusion that the St. Regis qualified as a dependent Indian community, the *Cook* Court was influenced by the "BIA['s] ... involve[ment] in the planning and funding of roads within the reservation [*i.e.,*] the six-mile tract of land designated in the 1796 treaty[.]" *See Cook*, 922 F.2d at 1030. The *Cook* Court looked to the fact that in its view the record demonstrated that in addition the BIA "is charged with maintaining the integrity of the lands and resources." *See id.*

The *Cook* Court did not detail the extent of the federal government's involvement in the planning of reservation roads; nor did it provide any specifics in terms of the amount of funding which the federal government purportedly supplies for such

roads. Furthermore, there is no explanation of the BIA's mandate in terms of "maintaining the integrity of the lands and resources." *See Cook,* 922 F.2d at 1031. The scope of the BIA's responsibilities *vis-a-vis* the St. Regis' land is unknown either from *Cook* of from the present record. There is no indication, for example, as there was in *Venetie III,* of even "minimal land-protections," such as exemption for adverse possession claims or from real property taxation. *See Venetie III,* 522 U.S. at 534, 118 S.Ct. at 956. Even if the record here did support a finding of such "minimal-land protections," it is clear under *Venetie III* that those protections standing alone, or in "tandem" with the provision of federal aid of the type outlined in *Cook,* would *not* be "indicia of *active federal control* over the Tribe's land sufficient to support a finding of federal superintendence." *See id.* (emphasis added).

For all of these reasons, plaintiff Thompson can no longer avoid tax liability based upon the dependent Indian community status of the St. Regis.

### E. Cass County

Obviously the court's focus until now has been solely upon *Venetie III.* As mentioned at the outset, however, that is only one aspect of the County's Rule 60(b) motion based upon an alleged change in controlling law. The County also argues that *Cass County* resulted in such a change justifying relief under that Rule.

The Supreme Court held in *Cass County* that "[w]hen Congress makes Indian reservation land freely alienable, it manifests an unmistakably clear intent to render such land subject to state and local taxation." *Cass County,* 524 U.S. at 115, 118 S.Ct. at 1911. Further, the *Cass County* Court held that "[t]he repurchase of such land by an Indian tribe does not cause the land to reassume tax-exempt status." *Id.* In light of that holding, the County maintains that regardless of whether plaintiff Thompson's property is Indian country, it is taxable because, as she concedes, it is

alienable. *See* Healy Aff., exh. 8 thereto at 17; exh.1 thereto at ¶ 4, and exh. 3 thereto at ¶ 5. As she did in arguing against the application of *Venetie III,* plaintiff Thompson counters that "*Cass County* ... *is* consistent ... with this court's conclusion [in *Thompson IV*] that [she] is immune from the County's ad valorem tax." Pl. Memo. at 13 (emphasis added). Accordingly, she reasons that *Cass County* does not constitute a change in law justifying relief under Rule 60(b).

In contrast to *Venetie III,* the issue of whether *Cass County* constitutes a change in law need not detain this court for long. That is so because the County's taxation authority is no longer at issue. Consequently, there is no need to consider the County's alternative argument that *Cass County* resulted in a change of law. Likewise, there is no need to address plaintiff's responding argument that *Thompson IV* actually comports with *Cass County,* and thus there has not been a change in the governing law.

Throughout this litigation, plaintiff Thompson has been claiming tax exempt status, arguing that because her property is Indian country as defined in 18 U.S.C. § 1151, it is not subject to the County's *ad valorem* taxes. Plaintiff has made this argument on two separate bases. Initially the primary focus of plaintiff's Indian country argument was that her property lies within the boundaries of the St. Regis reservation as created by the 1796 treaty. During oral argument of the parties' cross-motions for summary judgment though, "[a]t the court's prompting, ... plaintiff acknowledged that ... alternative[ly] she is arguing ... that her property lies within Indian country because it is located within a dependent Indian community—the second enumerated definition of Indian country contained in section 1151." *See Thompson IV,* 987 F.Supp. at 113 (footnote omitted).

The court rejected plaintiff Thompson's first argument because it was "persuaded

that the St. Regis Reservation as originally established by the 1796 Treaty was diminished by the subsequent conveyance agreements, and as a result [her] property no longer lies within the jurisdictional boundaries of that Reservation." *Id.* at 124. Thus, the court concluded that plaintiff's "property [wa]s not Indian country" under section 1151(a). *See id.* Now, as fully discussed herein, relying upon *Venetie III*, the court has also rejected plaintiff's second argument. Consequently, in the absence of a showing that her property is Indian country, *a fortiori* it is taxable by the County. Indeed, plaintiff Thompson conceded as much earlier in this litigation:

> If eventually *the court finds* that *plaintiff Thompson's property is not Indian country* within the meaning of section 1151, then *plaintiff concedes that ends the court's inquiry;* there is no need for the court to look any farther for an act of Congress authorizing taxation of plaintiff's property.

*Thompson IV,* 987 F.Supp. at 113 (citation omitted) (emphasis added). In light of the foregoing, the court need not delve into the issue of whether *Cass County* constitutes a change in the controlling law, warranting relief from judgment under Rule 60(b). Simply put, having now found that plaintiff has not shown that her property is Indian country within the meaning of section 1151, the issue of the County's taxing authority is moot. Plaintiff's property is not Indian country, therefore, it is taxable by the County.

### III. Rule 60(b)

Having found that *Venetie III* amounts to a change in the controlling law, the court is left with the procedural issue of whether such change is remediable under any of the three subsections of Rule 60(b) upon which the County relies. The first basis for the County's present motion is

that this claimed change in law constitutes a "mistake" within the meaning of Rule 60(b)*(1)*. Therefore, to correct that mistake, the County maintains that it should be relieved from the judgment previously entered herein. Second, the County asserts that after *Venetie III*[5], it is "no longer equitable that the judgment should have prospective application[,]" and hence it is entitled to relief from judgment under Rule 60(b)*(5)*. Lastly, in the event that the court finds that relief from judgment is not appropriate under either subsection one or subsection five of Rule 60(b), the County invokes subsection six of that Rule which allows for relief from operation of a final judgment for "any other reason[.]" *See* Fed.R.Civ.P. 60(b)(6). More specifically, the County is taking the position that *Venetie III* "altered"[6] the governing legal standard[s] to be applied in deciding what constitutes a dependent Indian community. The County views this change as an "extraordinary circumstance justifying relief under Rule 60(b)[ (6) ]." *See* Def. Reply at 5 (internal quotation marks and citation omitted).

■ Before examining the County's arguments under each of those three separate subsections of Rule 60(b), the court will briefly look at the interplay among those various subsections. Taking them in reverse order, Rule 60(b)(6), the broad, catch-all provision, only applies if none of the preceding five clauses of that Rule apply. *See Warren v. Garvin,* 219 F.3d 111, 114 (2d Cir.) (emphasis added), *cert. denied,* —— U.S. ——, 121 S.Ct. 404, 148 L.Ed.2d 312 (2000) ("Rule 60(b)(6) *only* applies if the reasons offered for relief from judgment are *not* covered under the more specific provisions of Rule 60(b)(1)-(5).") (citing *Liljeberg v. Health Serv. Acquisition Corp.,* 486 U.S. 847, 863 & n. 11, 108 S.Ct. 2194, 2204 & n. 11, 100 L.Ed.2d

---

5. In bringing this motion, plainly the County did not so limit itself. At this juncture, given the court's holding that it need not address the issue of whether *Cass County* also resulted in a change of law, the court will confine itself to a consideration of the effect of *Venetie III* upon the present lawsuit.

6. *See* Def. Memo. at 9.

855 (1988)); *see also PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 898 (2d Cir.1983) (citations omitted) ("Rule 60(b)(6) is a broadly drafted 'umbrella provision,' which must be read in conjunction with the other sections of that Rule, and is applicable only where the more specific provisions do not apply."); *cf. Fustok v. Conticommodity Services, Inc.*, 122 F.R.D. 151, 157 (S.D.N.Y.1988) (citation omitted), *aff'd on other grounds*, 873 F.2d 38 (2d Cir.1989) ("[T]o the extent [that the third party defendant] ... already raised this argument as a basis for relief under Rule 60(b)(4), he cannot pursue it under Rule 60(b)(6)."). In other words, "clauses (1)—(5) and clause (6) of Rule 60(b) are mutually exclusive." *Lehman Brothers, Inc. v. Masselli,* No. 93 Civ. 4478, 1998 WL 531831, at *5 (S.D.N.Y. Aug.24, 1998). Based upon that mutual exclusivity doctrine, the court must first consider whether either Rule 60(b)(1) or Rule 60(b)(5) governs the County's motion herein. Only if it determines that neither of those provisions applies to the present motion, will the court go on to consider the potential applicability of Rule 60(b)(6).

### a. Rule 60(b)(1)—"Mistake"

■ Insofar as Rule 60(b)(1) is concerned, the County argues that the change in controlling law occasioned by *Venetie III* law is a "mistake" for purposes of that Rule, and hence it is entitled to relief from judgment thereunder. Rule 60 does not independently define "mistake," but that word "can easily be interpreted to encompass errors of law." *See* Kevin Parker, Note, *Relief from Final Judgment Under Rule 60(b)(1) Due to Judicial Errors of Law,* 83 Mich. L.Rev. 1571, 1572 (1985) ("*Judicial Errors* "). "Errors of law," in turn, have been held to include disregarding a change in controlling law. *See id.* at 1576 (citing, *inter alia, Schildhaus v. Moe,* 335 F.2d 529 (2d Cir.1964)). Courts are split as to whether Rule 60(b)(1) is the proper procedural vehicle when a party is claiming an intervening change in control-

ling law. The Second Circuit has recognized that it is permissible for a party to invoke that Rule to correct such a "judicial error;" but it has severely limited the situations where Rule 60(b)(1) may be invoked based upon a purported change in controlling decisional law.

In *Tarkington v. United States Lines Co.*, 222 F.2d 358 (2d Cir.1955), a case upon which the County heavily relies, the Second Circuit "held that a change in decisional law as the result of a reversal by a higher court can be considered a 'mistake' for which Rule 60(b)[ (1) ] provides a remedy." *Turley v. New York City Police Dept.*, 988 F.Supp. 675, 685 (S.D.N.Y.1997), *aff'd in part, rev'd in part on other grounds,* 167 F.3d 757 (2d Cir.1999). More specifically, the Second Circuit held that when the Supreme Court rendered a decision, eleven days after entry of judgment, which "conflict[ed] with the case on which the trial judge relied in directing a verdict, th[at] ... judge should have treated plaintiff's motion as [one] under Fed. Rules Civ. Proc. rule 60(b), ..., to correct a mistake of the court." *See Tarkington,* 222 F.2d at 359 (citation omitted). Explaining the rationale of *Tarkington,* in a subsequent decision Judge Friendly wrote:

> Under such circumstances there is indeed good sense in permitting the trial court to correct its own error and, if it refuses, in allowing a timely appeal from the refusal; *no good purpose is served by requiring the parties to appeal to a higher court, often requiring remand for further trial proceedings,* when the trial court is equally able to correct its decision in the light of new authority on application made within the time permitted for appeal, ....

*Schildhaus,* 335 F.2d at 531 (emphasis added).

Judge Friendly commented that the *Tarkington* Court allowed such a procedure to be followed because of what he described as the "very special facts[ ]" of that case. *Id.* In contrast, the Second

Circuit in *Schildhaus* found no proper basis for plaintiff-appellant's Rule 60(b)(1) motion "for relief from judicial error more than eight months after the entry of judgment is made[.]" *Id.* In reaching that conclusion the Court pointedly stated that "Rule 60(b) was not intended as a substitute for a direct appeal from an erroneous judgment." *Id.* (internal quotation marks and citations omitted).

Plaintiff Thompson is arguing for a very strict, almost literal interpretation of the *Tarkington* line of cases. She is contending that the County is not entitled to relief under Rule 60(b)(1) because there are no "very special facts" here warranting relief thereunder. *See* Pl. Memo. at 4. Plaintiff attempts to distinguish *Tarkington* from the present case in three ways. First of all, no "very special facts" exist here, maintains plaintiff Thompson, because *Venetie III* is not "directly contrary" to the *Thompson IV* judgment. *See* Pl. Memo. at 4. This supposed distinction is not persuasive though. As previously discussed, application of *Venetie III* to the present case does reveal a conflict between that result and this court's conclusion in *Thompson IV*. Therefore, there has been a change in the law governing the definition of a dependent Indian community.

Second, plaintiff Thompson contends that the time difference between when the County brought the present motion and when the Rule 60(b) motion was brought in *Tarkington* (11 days after entry of judgment, as opposed to approximately eight months after entry of the original judgment herein) is a distinction which renders the *Tarkington* reasoning inapposite here. It is true that *Venetie III* was decided not a few days after entry of judgment in this case, but some two and a half months later. Likewise, it is true that here the County did not move for relief from judgment on the basis of *Venetie III* when it filed its first such motion, just two months after the Supreme Court rendered its decision in that case. The unique facts of this case, do not, however, convince the court

that the County's current motion should be procedurally barred on that basis. The court does not view that relatively short delay as a reason for denying the County's motion for relief from judgment under Rule 60(b)(1).

In the court's view, it is not so much the delay between the entry of judgment and the time the intervening change in case law occurs which is significant. Rather, the significance lies, as *Tarkington* and its progeny strongly suggest, in the fact that here, as in *Tarkington*, the County's time to appeal has not yet lapsed. As mentioned earlier, because the Second Circuit allowed the County to withdraw its original notice of appeal, and given that this case is on remand for amendment of the judgment, the County's time to appeal has not commenced running, and it will not until the court either grants or denies the County's Rule 60(b)(6) motions.

Third, plaintiff Thompson argues that judicial economy weighs in favor of the Second Circuit rather than this district court deciding the "legal questions" which *Venetie III* raises—questions which she contends "will be subject to de novo review by the court of appeals in any event." *See* Pl. Memo. at 5–6 (footnote omitted). Plaintiff further argues that especially with respect to *Venetie III*, it is only proper "that this Court defer to the Second Circuit, since the County argues that the Supreme Court has 'implicitly overruled' a Second Circuit decision [*Cook*] found determinative by this court in its judgment." *See id.* at 6 (quoting Def. Memo. at 12). Without providing any legal support, plaintiff Thompson is taking the position that "the continuing vitality of the Second Circuit's decision [in *Cook*] should be determined in the first instance by the Second Circuit." *Id.*

Judicial economy actually favors granting the County's motion for relief under Rule 60(b)(1) however. In particular, given the unique procedural posture of this case, at the risk of sounding repetitive, no final judgment has been entered in this

case yet. That is so because currently this case is on remand from the Second Circuit to allow this court to amend, based upon newly discovered evidence (plaintiff's resignation from the St. Regis Tribe), the previously entered judgment. Consequently, in terms of judicial economy, as long as this court must consider amending the judgment in accordance with the Second Circuit's mandate, there is no sound reason for not also considering the County's other arguments, based upon a change in law, in support of Rule 60(b) relief.

Moreover, as mentioned several times previously, the County's motion is timely. Admittedly a Rule 60(b)(1) motion cannot be made after the time to appeal has lapsed; but that is not the situation here. The County's time to appeal has not yet commenced running in that no final judgment has been entered given the Second Circuit's remand. This motion is also timely under Rule 60(b), which provides that motions brought pursuant to subsection one of that Rule must "be made within a reasonable time, and ... not more than one year after the judgment, ... was entered[.]" Fed.R.Civ.P. 60(b). The judgment herein was entered on December 8, 1997, and the current motion based upon a change in controlling law was filed on October 28, 1998—less than a year after the entry of judgment.

Exercising "discretionary reconsideration" under Rule 60(b)(1) of this timely motion will "prevent[ ] 'the unnecessary wasting of energies by both appellate courts and litigants[,]'" see Def. Memo., exh. A thereto (*Winnik v. Chater*, 1998 WL 151041 (S.D.N.Y. April 1, 1998) (quoting *Oliver v. Home Indemnity Co.*, 470 F.2d 329, 330 (5th Cir.1972)) (other citation omitted)), thus promoting judicial efficiency. In a similar vein, "by employing a judge already familiar with the merits of the case, a rule 60(b)(1) motion prevents judicial inconvenience and expense by avoiding a duplication of effort in the trial and appellate courts." *Judicial Error*, 83 Mich. L.Rev. at 1573 (footnote omitted).

Principles of comity also "favor ... allowing a trial judge to correct his or her own error before an appeal is taken." *Id.* (footnote omitted). "Allowing trial judges to correct their own errors of law in clear cases is almost always preferable to the corrective action of appellate benches." *Id.* (footnote omitted).

Despite the foregoing, because this case will be appealed to the Second Circuit, plaintiff Thompson argues that judicial resources will not be conserved if the County is allowed to proceed with this motion. The court is fully cognizant of the inevitability of an appeal here, regardless of the outcome of the present motions. However, as stated several times herein, practically speaking, it makes sense for this court to consider *all* of the County's Rule 60(b) arguments at once, as opposed to having this court simply amend the judgment in accordance with the mandate and *Thompson IV*, have one or the other or both parties appeal, and then have the Second Circuit remand this action for consideration in light of *Venetie III*, and perhaps *Cass County*.

In addition, the court cannot ignore the fact that this motion is not a harmful "substitute for an appeal" because that occurs only when a timely appeal has not been filed and a party waits until after the time to appeal has run, and then seeks to reopen a case by filing a Rule 60(b)(1) motion, *see* L.R. Note at 1576. As previously explained, however, both in terms of the appeal process and in terms of the time limits of Rule 60(b), this motion *is* timely. Thus, the County is not seeking to circumvent the appellate process by relying upon Rule 60(b)(1) where a timely notice of appeal was not filed. Succinctly put, proceeding in the fashion described herein, with this district court considering *all* of the Rule 60(b) arguments which the County is advancing and has advanced in connection with the original judgment, is fully consistent with the liberal construction to be accorded that Rule. *See Freschi v.*

*Grand Coal Venture,* 103 F.R.D. 606, 608 (S.D.N.Y.1984).

### b. Rule 60(b)(5)—"Prospective Application"

Turning next to the County's reliance upon Rule 60(b)(5), the County maintains that it is also entitled for relief from judgment under that provision because when plaintiff sought a declaration that she is immune from the County's taxing authority, and when this court agreed in *Thompson IV,* such a declaration necessarily has prospective relief and it would be inequitable now, in light of *Venetie III* to allow that judgment to stand. Based upon *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754 (2d Cir.1986), wherein the Court, in *dicta* stated that "[a] change in decisional law *is* cognizable under Rule 60(b)(5), the County argues that due to the change in law marked by *Venetie III,* it is also entitled to relief from judgment under this particular subdivision of Rule 60(b)." *Id.* at 757 n. 4 (citations omitted). Also relying upon *Sarkisian,* plaintiff Thompson counters that the County's reliance upon subsection five is misplaced because the County can protect itself on appeal. *See id.* On the other hand, the County contends that the availability of an appeal does not preclude relief under subsection 5. Thus, the issue becomes whether, in light of the change in law due to *Venetie III* it would be inequitable for the judgment here to have prospective application—an issue which neither party addressed.

As more fully discussed above, the court is convinced that there are "special circumstances," in the form of a change in the governing law as a consequence of the Supreme Court's decision in *Venetie III,* which make prospective application of the December 8, 1997 judgment unjust in this case. *See United States v. International Brotherhood of Teamsters,* 51 F.Supp.2d 314, 318 (S.D.N.Y. 1999). Given this court's finding that *Venetie III* mandates a change in result here such that the St.

Regis can no longer be considered a dependent Indian community, clearly plaintiff would be unjustly enriched if the original judgment were not vacated and she was still able to claim tax exempt status.

### c. Rule 60(b)(6)—"Extraordinary Circumstances"

■ Based upon the court's ruling herein that . . . . ., as previously discussed, the County's motion for relief from judgment under Rule 60(b)(6) fails based upon the mutual exclusivity doctrine. *See Lehman Brothers,* 1998 WL 531831, at *5. That Rule also does not come into play here because ordinarily, "an intervening change in law rarely constitutes 'extraordinary circumstances' or 'extreme and undue hardship' justifying vacateur of a final judgment under subsection (6) of Rule 60(b)." *See Commonwealth State Bank v. Kleinhandler,* No. 18 MS 0302(SS), 1997 WL 328604, at *2 ( S.D.N.Y. June 16, 1997). And, as should be obvious by now, a claimed change in decisional law is the *only* basis for the County's pending motion. Finally, it should be noted that "Rule 60(b)(6) has been held to demand even *more* 'extraordinary circumstances' than those permitting relief under Rules 60(b)(1) through 60(b)(5)[.]" 1997 WL 122783, at *6 (S.D.N.Y.1997) (citing *Ackermann v. United States,* 340 U.S. 193, 199, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950)) (emphasis added). Although, as discussed above, the County has shown exceptional circumstances warranting relief under Rule 60(b)(1) and 60(b)(5), it has not met the even higher threshold showing necessary for relief under Rule 60(b)(6). Consequently, while the County is entitled to relief from judgment under Rules 60(b)(1) and (5), it is not entitled to that same relief under Rule 60(b)(6).

### Conclusion

In accordance with the Second Circuit's mandate, *see* Healy Aff., exh. 14 thereto, and for the reasons outlined in *Thompson V,* the court hereby grants the County's

motion for relief from judgment based upon newly discovered evidence, *i.e.* Mrs. Thompson's resignation from the St. Regis Tribe as of June 27, 1997, the date of her retraction letter. *See Thompson V,* 180 F.R.D. at 225. This particular ruling means that plaintiff Dana Leigh Thompson "is liable to the County for *ad valorem* taxes *after* that date." *Id.* at 226 (emphasis added). Then, because the court has found that *Venetie III* changed the controlling law here in terms of the standard to be employed in ascertaining dependent Indian community status, for the reasons set forth herein, plaintiff Thompson is liable for *ad valorem* taxes on her property *both* prior to and after the date she retracted her membership in the St. Regis Tribe. In other words, there are two possible bases for plaintiff's tax liability after her resignation date. First, there is the fact that she is no longer a tribal member; and second, she cannot claim tax exempt status based upon the supposed Indian country status of her property because that property neither lies within a reservation under subsection (a) of the Indian country statute, 18 U.S.C. § 1151(a), nor is the St. Regis a dependent Indian community under subsection (b) of that statute. In light of the foregoing, the court hereby finds that plaintiff Dana Leigh Thompson is liable to the County of Franklin for *ad valorem* taxes on the sixty-eight acres which are the subject of this litigation. That liability extends from the time she first acquired the property, in 1989, *see* Healy Aff., exh. 1 thereto (complaint), until such time as she no longer owns that property in fee simple.

The Clerk of the Court is hereby directed to enter judgment in accordance herewith.

IT IS SO ORDERED.